Brian K. Jackson (15296)
Brian K. Jackson, LLC
305 W. 2600 S. Suite 200
Bountiful, UT 84010
Phone: (801) 441-8922
brianj@bjacksonlaw.com
Attorney for the Jane DOE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| ███████<br>(JANE DOE)<br>v.<br><br>Weber State University.<br>    Defendant, | **COMPLAINT**<br><br>Civil No.:<br><br>*JURY TRIAL REQUESTED* |

Plaintiff, Jane Doe, in her individual capacity, through counsel of record, now brings this action for injunctive and monetary relief in Federal District Court against Defendant, Weber State University, based on the following:

### PARTIES, JURISDICTION, VENUE

1. Plaintiff, ███████ acting under alias of Jane Doe, is a former student of Weber State University and was in attendance from August 2009 to April 2014 and August 2016 to April 2019 . Ms. Doe is a resident of Davis County, Utah.

2. Defendant, Weber State University, is a higher education institution located in Weber County, Utah.

3. Venue is proper pursuant to 28 U.S.C § 1391(b)(1) and (2) as the incident alleged occurred in Weber County and Defendant is located in Weber County, Utah.

4. Federal Jurisdiction is proper as this is a matter arises out of a federal question under Title IX of the Education Amendments of 1972.

## LEGAL CLAIM

## VIOLATION OF TITLE IX EDUCATION AMENDMENTS OF 1972

**a.  Factual allegations**

5.  Ms. Doe was a student of Weber State University that receives federal educational assistance funds. Ms. Doe was a student at the University based on the dates in the allegations below.

6.  In 2011, Ms. Doe had an issue with a professor when he pointed out that Ms. Doe had misspelled a word in an e-mail. Ms. Doe was concerned it as a prod at her ethnic origin as a Mexican and expressed her concerns to the Department Chair. Thereafter, Ms. Doe was contacted by the Title IX - AA/EO's Executive Director Barry Gomberg via phone call indicating that he needed to talk to Ms. Doe about the complaint to the chair and options. At an in-person meeting, Mr. Gomberg told Ms. Doe two stories. One story was about overreacting, and another was about playing the "race" card. He asked if Ms. Doe was going to sue the University and implied that Ms. Doe had made a big deal out of nothing.

7.  Ms. Doe later met with the Dean of students, Jeff Hurst and thought she was being treated unfairly as well with him. He indicated that "you can't control anyone's behavior." Ms. Doe left the office crying and noted that she didn't want to waste anyone's time anymore. Ms. Doe later indicated to a counselor, Jennette Wood, that Ms. Doe had such a negative experience at the compliance office that she would never go back there. Ms. Doe also told the multicultural Student Center Director Michiko Nakashima-Lizarazo this during a focus group.

8.  In the Spring of 2013, a psychology department professor, Doctor Baird, approached Ms. Doe on the campus and talked to Ms. Doe. Professor Baird as a result of the conversation, solicited her by offering his private services as a counselor to help address some of the issues Ms. Doe suffered. Ms. Doe felt like he could trust Doctor Baird as he had indicated that he was in the same religion

as her and was in a position of authority over a local congregation and would talk about religion often.

9.      During the course of the counseling, Professor Baird would claim to do therapeutic exercises to Ms. Doe to "challenge" her that included touching Ms. Doe. Professor Baird would claim it was part of the exercises, such as placing his hands on her ribcage. The Professor was also aware that Ms. Doe suffered from past traumatic situations including past sexual abuse as a child. Professor Baird told Ms. Doe to pay him in cash.

10.     In the Fall of 2013, Doctor Baird became more open with Ms. Doe and would say inappropriate things on campus such as inviting her to go swimming naked with him. He also suggested that she take one of his classes at that time. Doctor Baird would disclose personal information about himself, other therapy patients, and his students and colleagues at WSU.

11.     In the Spring of 2014, Ms. Doe took a class from Doctor Baird. Doctor Baird claimed he reported the conflict of interest to his then supervisor and current Weber State's Vice Provost, Eric Amsel, who claimed that the situation with a student as a patient was ok. During a class lecture, Ms. Doe entered the classroom in chronic pain on crutches. Doctor Baird made a joke about it in front of the whole class. Ms. Doe stopped attending his class at that point.

12.     Doctor Baird started hugging Ms. Doe during therapy sessions in the summer of 2014 and conducted a "mindfulness" exercise that involved intimate physical touch purported as therapeutic. Doctor Baird continued disclosing private and personal details about two of his female students: April Knight and Tricia Dirks. At this time, Ms. Doe discovered that, Jane Harvey, another student from her undergraduate program was also a therapy patient of Doctor Baird. His inappropriate behavior started to escalate in the Spring of 2015 during the sessions. Doctor Baird massaged part of the gluteal area of Ms. Doe and asked if she had orgasmed. Ms. Doe stopped sessions at that

point and sent an e-mail May 7th, terminating therapy.

13.     Ms. Doe approached Doctor Baird about the last session and Doctor Baird indicated that he could say Ms. Doe was a slut when she said she felt used and he was like a narcissist playing with his toy.

14.     During this time as well in May of 2015 in a lunch meeting with Jaclyn Knapp, a colleague of Mr. Baird at the psychology department indicated that Doctor Baird had been inappropriate with other students and she and another colleague from the counseling center, Dianna Abel, were worried about his pattern of behavior and "mindfulness exercises." The same kind used on Ms. Doe. When Ms. Doe approached Ms. Knapp about the situation, Ms. Knapp asked if it was Doctor Baird without knowing who the therapist was.

15.     In a later investigation by Mr. Morris Haggerty, it was noted that Ms. Knapp reached out to Dianna Abel, the director of Weber State counseling services about the situation regarding Ms. Doe and Doctor Baird. The interview noted that Ms. Abel was aware that it regarded sexual behavior and that Ms. Abel expressed her disappointment with Doctor Baird. Ms. Knapp claimed she contacted DOPL when she was interviewed by the Ogden City Police. Ms. Abel did not share or corrborate this story when Ms. Doe later when she reached out to Ms. Doe in August of 2018.

16.     Neither Ms. Abel nor Ms. Knapp were bound by confidentiality as neither was the therapist of Ms. Doe. Further, Ms. Abel is part of the WSU's STAR (Strategic Threat Assessment and Response Team (STAR) at WSU: "The Strategic Threat Assessment and Response (STAR) Team evaluates potential safety threats to the members of the Weber State University community in an effort to help the campus be a safe and secure working and learning environment in accordance with Weber State PPM 3-67. The team works to identify and assess potential threats and makes recommendations to reduce or eliminate those threats."

17.     Thereafter, in the Fall of 2015, Ms. Doe discovered she had a tumor in her breast and requested the assistance of Doctor Baird given the pain she was in. During that time, Doctor Baird made more inappropriate comments such as joking that at least she would get a boob job out of having breast cancer, asking her to see a nude selfie of her torso, viewing her boudoir pictures or make jokes like if she felt like she was a prostitute when she had fake eyebrows drawn on her.

18.     In the Spring of 2016, Doctor Baird continued his misconduct during sessions and asked Ms. Doe to stand in front of him while he sat, so he could grab her thighs and place his hands on his belly to "see" how much weight she had lost during chemotherapy. He would also touch her breasts (where the chemotherapy port and the tumor site were) multiple times.

19.     Doctor Baird would also ask Ms. Doe for additional co-pay even though Ms. Doe had reached her maximum-out-of-pocket amount. Ms. Doe again terminated therapy in July of 2016.

20.     Ms. Doe took a course from Professor Baird in the Fall of 2017 after attempting to take it from someone else, and realized that his actions and his treatment of Ms. Doe was unethical, that he knew what he had done during therapy and that it was neither therapeutic nor professional.

21.     Ms. Doe confronted Professor Baird about his counseling techniques and ethics on December 1st and December 4th of 2017.  At that time, Professor Baird offered to have Aaron Ashley, the current psychology department chair, grade her work instead on December 4th, 2017.

22.     Due to the conflict with Professor Baird on December 4th 2017, Ms. Doe went to the counseling center at Weber State University in crisis. She was told that she needed to file a complaint with the Title IX office and one could not be made on her behalf. Ms. Abel, as WSU counseling center's director, was told by all three counselors involved about Ms. Doe's case. Ms. Doe reported the incidents to the LDS church on December, 24th, 2017 after Doctor Baird revealed to her he now occupied a higher ecclesiastical position within it to prove he was a good man. Ms.

Doe reported the issues to DOPL on December 31st, 2017.

23.     In January of 2018, Ms. Doe told Ms. Knapp, that she reported the issues to DOPL and that they might call her. Ms. Knapp said it wasn't a problem and that DOPL should also call Dianna Abel because she also had more information on Doctor Baird.

24.     Ms. Doe filed a police report in March 2018. After doing so, she became increasingly fearful and stressed. Fearing an adverse reaction from Professor Baird, Ms. Doe went to WSU's registrar's office in April 2018 to request her student records be locked. That office said it was unable to prevent Professor Baird from accessing Ms. Doe's student records and they referred her to the new deputy at the Title IX office, Aaron Garza. At that same time, she met with Mr. Garza and she requested help to lock her student records. Ms. Doe also expressed her distrust of Mr. Gomberg to Mr. Garza. Mr. Garza told Ms. Doe he would call her after he spoke to WSU's registrar and find out a technical way to block a specific person from accessing Ms. Doe's records. Mr. Garza never called Ms. Doe.

25.     Ms. Doe did not want to file a complaint with the Title IX office given her past experience with Mr. Gomberg and the lack of follow through from Mr. Garza. Ms. Doe didn't want to talk with Mr. Gomberg at all again which she indicated to the police during a criminal investigation she filed in March of 2018. Ms. Doe indicated she didn't trust him.  Ms. Doe confided about the case to two classmates in June of 2018 and one of them indicated that one of her other friends was dealing with a harassment / attempted assault and things were not going well for her with WSU because she was dealing with Barry Gomberg who was trying to protect WSU.

26.     In August of 2018, Ms. Doe was contacted by Dianna Abel with the WSU counseling center to sign a release for local law enforcement to speak to the counselors that she and Doctor Baird had interacted with at the counseling center. Ms. Abel indicated to Ms. Doe she would be

willing to talk to investigating authorities. Ms. Doe also noted her distrust with the Title IX office and Barry Gomberg at that time.

27.    Ms. Abel, according to the Ogden Police report was advised not to speak to investigating authorities or to Ms. Knapp. Ms. Abel indicated to Ms. Doe she had talked to Ms. Knapp prior. At that point, the Weber State University Campus police were involved as well as the legal department. The Ogden Police Department did interview Jaclyn Knapp. Weber State University never interviewed her.

28.    On August 23rd, 2018, Ms. Doe talked to Weber State University PD Chief Dane LeBlanc and she also was candid about her experience with the Title IX office and experiences she had heard from others. Ms. Doe was asked to write a statement and to talk to Paige Davies with the women's center and detective Tessie Zarogoza from WSU PD. Ms. Doe provided Ms. Zarogoza information about Professor Baird's involvement with the other three female students and also expressed to them her distrust of the the Title IX office.

29.    Ms. Doe obtained an e-mail from the Weber State legal department on September 5th, 2018 with options that would not involve Barry Gomberg or Jeff Hurst. The day prior Chief LeBlanc called Ms. Doe and told her that WSU would not conduct a separate investigation into Professor Baird's breaches of Weber State's code of ethics.

30.    On October 30th, 2018, Ms. Doe was told that the University hired external an investigator, Jody Shipper, to investigate the concerns Ms. Doe raised. Ms. Doe responded in November of 2018 indicating concerns on how Ms. Shipper mishandled sexual assault and rape cases at another major university and her doubts as to what her primary responsibility would be. Ms. Doe indicated that she was concerned that the individuals in charge of handling complaints would be more concerned about protecting the institution than victims. Ms. Doe continued to have concerns as to

neutrality.

31.     Shortly thereafter, the University came up with another investigator, Ashley Leonard. As to preparing a formal complaint, Ms. Doe noted at that time to WSU's legal department: "After reading your emails it's even more overwhelming to me now to have to read over the policy you sent and try to wrap my head around this. And then have to file a formal complaint and submit the evidence. It is just placing yet another heavy burden on my time at an already difficult time in dealing with the other investigations, my school and personal life."

32.     Thereafter, Ms. Doe was told that she needed to prepare and sign a formal complaint in December of 2018.

33.     The Davis County Prosecutor reviewed the criminal case due to conflict with Weber County and determined not to move forward due to the statute of limitations in November of 2018.

34.     In January of 2019, Weber State initiated a Title IX investigation and Ms. Doe was interviewed for four hours. Ms. Doe detailed to the investigator, Ashley Leonard, Professor Baird's multiple instances of misconduct not only toward her but other instances involving Doctor Baird and other individuals.

35.     Doctor Baird accessed Ms. Doe's students records without her written expressed consent[1] to retrieve her homework assignments and profile picture from Canvas, the school learning system to use as "evidence" against Ms. Doe. The Family Educational Rights and Privacy Act (FERPA) under 34 CFR § 99.31(a)(1)(i)(A) allows for disclosure without consent if "The disclosure is to other school officials, including teachers, within the agency or institution whom the agency or institution has determined to have legitimate educational interests." Doctor Baird had no legitimate educational interests when he accessed her student records. He submitted Ms. Doe's class

---

[1] 34 CFR § 99.30

assignments to falsely claim Ms. Doe had a personality disorder and was a hypersexualized individual. Doctor Baird also defamed Ms. Doe's character by falsely claiming she had had an affair with a professor from her undergraduate program.

36.     Ashley Leonard with the Attorney General's office acted as neutral third-party investigator and issued a final report on May 2nd, 2019. Ms. Leonard came to the following conclusions as to sexual harassment: "Baird's conduct towards [Doe] was more than likely unwelcome. The conduct was more than likely severe, and Baird ran the risk of creating a hostile environment if his conduct limited or denied [Doe's] ability to participate in or benefit from WSU programs. When that situation actually occurred, Baird was responsible for the ensuing hostile environment Doe experienced. This conduct constitutes a violation of Weber State's 1998-2014 discrimination and harassment policy and a violation of the 2014-2018 discrimination and harassment policy."

37.     Ms. Leonard came to the conclusion of conflict of interest and co-mingling of business: "Baird's entanglement of treating a WSU student for private therapy, then assenting to the student taking WSU classes from him, created a conflict of interest. The predicament ranged from minor violations of policy, such as using WSU stationery for his private business, to major violations, such as creating a hostile learning environment against the student."

38.     Thereafter, Doctor Madonne Miner, the University Provost over the investigation, asked for access to Ms. Doe' drive which had additional evidence. None of the additional evidence was considered and all information related to any other WSU student or staff were excluded. The Provost increased scrutiny requesting an additional investigation because she believed she needed additional information to help her evaluate the disputed issues. Ms. Doe also requested that all WSU students and faculty and staff involved be interviewed at that time.

39.     An Assistant Attorney General staffed at Weber State, Morris Haggerty, was appointed to

supplement the investigation report with his own investigation. Some of the allegations that involved other individuals and female interactions with Doctor Baird Mr. Haggerty claimed could not be verified. Morris Haggerty indicated that a father of a female student patient complained in 2004 on touching her during a breathing exercise. Another incident was reported to the Ogden City Police Department in December of 2018 of a juvenile female and inappropriate conduct toward her during a therapy session. One student noted, "[Doctor Baird] Exploited the power differential between students and professors and playing inappropriate mind games." The report indicated that the three incidents with counseling demonstrated a pattern of "predation" on the patients. According to this report, Mr. Haggerty began interviewing witnesses on July 23rd.

40.    In the Ogden Police report for Ms. Doe's case, Ms. Knapp indicated that with her interactions with Doctor Baird, he would inappropriately touch the female students. He would also say dirty things, "just to get a rise out of the girls and make them feel uncomfortable" and she had to train the females not to react to the comments. Ms. Knapp also indicated that during a research trip, there was a shortage of rooms in the hotel they stayed and as a result, Doctor Baird offered to share rooms with another female student. Ms. Knapp had to share the room with Doctor Baird even though she didn't want to. Doctor Ashley confirmed that Ms. Knapp shared a room with Doctor Baird.

41.    Ms. Knapp also indicated Doctor Baird had been in a relationship with another female student in the past and that he told Ms. Knapp "that Trish was leaving underwear for him and that she was really after him." Mr. Haggerty indicated he did not interview Ms. Knapp because she worked at Park City and would not return his messages. Ms. Leonard also indicated in her report that Ms. Knapp did not "respond to the investigator's attempts" for an interview. The website at Weber State University in December of 2019, indicated Ms. Knapp still worked there. Class

searches for Fall 2018,  and Spring, Summer, and Fall 2019 course enrollment form and note that Ms. Knapp was set to teach 11 different courses for those years. This year's course enrollments for Spring, Summer and Fall semesters indicate Ms. Knapp is still currently employed at WSU.

42.     Ms. Doe's Ogden Police report also contained record of a man who reportedly was under Doctor Baird's care when he was a teenager. The man contacted WSU human resources office in 2012 accusing Doctor Baird of having abused him for a period of seven months while under his care.

43.     The supplemental investigation report was completed August 9th, 2019 and indicated that the police report regarding the minor patient was reviewed. The un-redacted Ogden Police report related to Ms. Doe's case was reviewed by Ms. Leonard during the initial investigation. The un-redacted report was obtained by Ms. Leonard in February 12, 2019.

44.     Jenette Wood, a counselor at the WSU counseling center confirmed about another relationship Doctor Baird had with another student from reliable sources. Ms. Wood also indicated that the concerns Ms. Doe raised were also concerns that she had heard as well, and her concerns were valid. Ms. Wood also confirmed the office issues raised by Ms. Knapp as to inappropriate behavior of Doctor Baird.

45.     Another counselor at WSU, Craig Oreshnick, indicated that he wanted Ms. Doe to report the incident to the University to make her feel "empowered" when she reported her concerns to him. Mr. Oreshnick also indicated that other incidents were Mr. Baird's professional conduct was called into question. All the counselors indicated that the patient / student relationship was a conflict of interest and that Ms. Doe's statements were consistent. Neither Mr. Orenshnick, nor Ms. Wood were contacted as part of the follow-up investigation, or the initial investigation. Ms. Doe offered to sign a confidentiality release to the initial investigator for these counselors to be

interviewed, but the offer was declined.

46.     Mr. Haggerty interviewed Doctor Aaron Jeffrey, a counselor in the counseling center who had treated Ms. Doe without Ms. Doe's expressed consent. Doctor Jeffrey complied with federal laws (HIPPA) by not responding to Mr. Haggerty's questions, but Mr. Haggerty openly disclosed in his report that Ms. Doe had been seen by Doctor Jeffrey.

47.     Azenett Garza, a faculty member with Weber State indicated in an e-mail about two complaints from students regarding Doctor Baird that made them uncomfortable. There is no indication Mr. Haggerty followed-up with the specific details of those complaints.

48.     Upon reading Mr. Haggerty's report, Ms. Doe became extremely concerned that he did not ask direct and pertinent questions during his interview and seemed confused about the facts and allegations. Ms. Doe believed that the report was favoring Doctor Baird in shielding him from any negative light pertaining to his work and conduct as a professor. Based on that belief, Ms. Doe reached out to her former WSU counselor who had offered to help shed light on Doctor Baird's unprofessional conduct. Ms. Doe's former advisor indicated to her that she had already contacted them and that she was told the information she had "would legally be considered hearsay." Her former advisor responded she had spoken with "Barry [Gomberg] on the phone".

49.     At the same time, Ms. Doe also met with Tricia Driks on September 3, 2019. Ms. Doe found out more disturbing details about Doctor Baird's conduct with Ms. Dirks and that he had misrepresented the nature of the investigation to Ms. Dirks. Ms. Dirks shared that Doctor Baird had called her telling her that he was being accused of having sex with her and two other female students.

50.     On September 19th, 2019, the Provost issued a memorandum that indicated. Given these additional complaints and in light of Dr. Baird's own admissions on the tapes dated early

December, 2017, I find that there is reasonable cause to believe that violations of the following policies have occurred:

Violated PPM 3-32a.  As a faculty member and therapist, Dr. was in a position of "special trust" relative to Ms. [Doe], a student and client. PPM 3-32a clearly precludes amorous or sexual relationships "where there exists a power imbalance in the relationship."  On the tapes Dr. Baird acknowledges that his therapeutic relationship with Ms. Baird got "too close."  He asks: "Was our relationship –was it – did it meet all the standards?  No.  It didn't."  He says: "And when – when I – when we felt those feelings, I should have just – I should have never – there should have never been physical contact ever again.  There should have never been."  He also says, "I remember hugging you.  I remember there were feelings of arousal for both of us. . . . I remember there was [sic] a few hugs that were – that they felt sexual.  They felt inappropriate.  I admit that.  You're right.  And – and I'm sorry."   My reading of the evidence indicates that it is more likely than not that Dr. Baird had an amorous relationship with Ms. [Doe] , a relationship that presents a clear conflict of interest with his role as therapist and faculty member.

 Violated PPM 3-32.  This PPM deals with the creation of a hostile environment that would deny a student the opportunity to participate in or benefit from a University program.  Dr. Baird's relationship with Ms. [Doe] presented barriers to her full participation in coursework offered by the University.  Along with Ms. Leonard, I conclude that "[o]nce [Doe] enrolled in Baird's Abnormal Psychology course, Baird had the responsibility to manage the environment as the person in authority, but he failed to even try."

Violated PPM 9-5.  Three sections of this PPM, Faculty Responsibilities to Students, seem pertinent here: section 7 ("Neither in nor out of the instructional setting or office do faculty members take advantage of their relationships with students to exploit them for the faculty members' own purposes."); section 10 ("Faculty members do not reveal matters received by them in confidence from a student unless required by law.");  and section 12 ("Serious conflicts of interest between a faculty member and a student, including but not limited to sexual or financial relationships, are prohibited.").  It appears that Dr. Baird took advantage of his relationship with Ms. [Doe] for his own purposes, shared information with her about other students (Tricia Dirks, April Knight), and engaged in conflicts of interest because of dissonance among  his roles as faculty member, therapist, and human being engaged in an amorous relationship with a student and client.

51.     The Provost recommended that Doctor Baird be placed on leave without pay for one year.

Ms. Doe disagreed with the decision and the University policy required her to file a formal charge

with the Faculty Board of Review. Ms. Doe requested prior disciplinary action of Doctor Baird as

part of the process and none was given to her.

52.     At the Faculty Board of Review hearing, the Provost claimed there was no prior

disciplinary action against Doctor Baird. However, the Provost indicated that no complaints from the Weber State counseling center were reviewed and that complaints from the center are not reviewed as part as prior disciplinary action and she did not review any of those complaints.

53.     None of those complaints were produced. Ms. Doe also produced complaints made by parents from a local school as to a study that Doctor Baird conducted without parents' permission. The story of the complaints was published in the Standard Examiner. The Provost indicated that an investigation was never conducted on Doctor Baird from the incident because no one had formally filed a complaint with Weber State University.

54.     The Provost also indicated there are no regulations as to how much time a Professor can work in a private practice on top of its teaching duties. The business entity search of Utah indicates that Doctor Baird's practice was a not a licensed business when he solicited her business and during the first two years he treated Ms. Doe.

55.     Ms. Doe had to prosecute the case, including the additional allegations of other individuals from the counseling center at her own cost. The Faculty Board of Review ultimately determined that the disciplinary action was not sufficient and required termination.

**a.  Legal Allegations.**

56.     Ms. Doe incorporates the factual allegations into the legal allegation claims.

57.     *"Title IX is enforceable through an individual's private right of action and allows for the recovery of damages. Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 639 (1999) (citing Cannon, 441 U.S. 607 and Franklin v. Gwinnett Cty. Public Schs., 503 U.S. 60 (1992)). Title IX claims are commonly asserted in response to a student's sexual harassment or assault.*

58.     *The Supreme Court has held that sexual harassment within a school or school program is*

*a form of sex discrimination when the harassment is so severe, pervasive, and objectively offensive that it deprives the victim of educational opportunities or benefits provided by the school. Davis, 526 U.S. at 650.*

59.  *A school can be held liable for such harassment when it is deliberately indifferent to harassment of which it has actual knowledge. Id. This is true regardless of whether the harasser is an employee of the school or another student, but liability under this avenue is limited to circumstances in which the school "exercises substantial control over both the harasser and the context" in which the harassment occurs. Id. at 645.*

60.  *This framework for liability in sexual harassment cases ultimately serves as a proxy for the showing of intentional discrimination that is otherwise required for Title IX claims. Thus, while the school is not itself committing the sexual harassment, it can be said to be intentionally discriminating if it knows of severe and pervasive sexual harassment occurring within its control and, for example, does nothing. Gebser, 524 U.S. at 290."*

61.  Ms. Doe alleges that Doctor Baird used his title as a professor to lure Ms. Doe in as a client who was a student at Weber State University. The actions of Doctor Baird during the sessions was unwanted sexual conduct. Ms. Doe was under the impression that the actions were therapeutic in nature and learned later they were not therapeutic in nature. The University also failed to properly remedy the situation upon notice of the conflict of interest. The time and events that took place and unwanted sexual advances was also objectively severe and pervasive and objectively offensive. Ms. Doe also incorporates the findings of the investigation of Ashley Leonard as to the severity of the harassment she had from Doctor Baird.

**i. Deliberate indifference of knowledge of the situation years prior.**

62.  Ms. Doe alleges that the School was aware of the violations with the notice Ms. Doe sent

to Ms. Knapp in 2015 as well as to Ms. Abel through Ms. Knapp at that same time. Ms. Knapp also and Ms. Abel also had knowledge of past incidents regarding Doctor Baird that was never remedied as further indicated in more detail below. The School failed to take proper and prompt and or effective action on both of the situations calculated to prevent the recurrence to remedy the effects, the situations they were aware of. Doctor Baird's supervisors, Doctor Amsel and Doctor Ashley, were also aware of the conflict of interest, counter-transference and accusations that arose with Doctor Baird having one of his patients enrolled in his classes during 2014 and 2017.

63.     No investigation was triggered in 2015 or 2017. No investigation was triggered with other issues regarding other females. No investigation was triggered in an incident with a juvenile in January of 2018. No investigation was triggered when the campus was aware of the Ogden Police's investigation. No investigation was conducted when Ms. Doe reported the misconduct to counselors in December of 2017.

64.     The school with the claim that Ms. Doe had to report the incident herself and the school's own internal issues with the Title IX office, hampered the early notification and prevention of the events that transpired after 2015.

65.     Also, the University through the Provost indicates that no Professor is investigated for disciplinary action unless a complaint is made. Even though Ms. Doe told Ms. Knapp of the situation, the University did nothing until she actually made her own complaint. Notwithstanding Mr. Amsel's claims that Professor Baird notified him in 2014 of a potential conflict of interest and that Mr. Amsel, as Professor Baird's supervisor, had knowledge and concerns about potential counter-transference issues with the student (Ms. Doe), there was no follow-up and no further investigation as to how the student might be affected. Furthermore, Mr. Aaron Ashley, Professor Baird's supervisor in 2017, was informed by Professor Baird that one of his female students and

formal therapy client was making accusations against him. Mr. Ashley, knowing of the former and current conflict of interest and a student's accusations against Professor Baird, neither investigated further nor reported the issue to WSU's Title IX office.  Also, no other disciplinary action were made with the other complaints from other females. No action was ensued with the complaint from the juvenile in 2018 because the juvenile didn't make the complaint.

66.     Ms. Doe maintains that her treatment was sexual harassment within a school in the form of discrimination that was so severe and pervasive and offensive that it deprived her of the opportunities and benefits of the school and that the school was deliberately indifferent to the harassment of which it had actual knowledge.

67.     The policies of the University made it so there were no specific guidelines as to a public professor and his private practice and the amount of time the professor spend to each area. The University also had no policy to verify whether or not Doctor Baird worked in a valid licensed business. Ms. Abel indicated to Mr. Haggerty she was not aware of the private practice of Doctor Baird. At the same time, she also told Mr. Haggerty that Ms. Knapp disclosed "troubling events" related to Doctor Baird's therapy and that it was "sexual behavior." Ms. Abel "expressed disappointment in Dr. Baird." The University was aware of an incident regarding the same facts and scenario of another female student in 2004 and Doctor Baird was never disciplined or investigated for it as it appears that complaints from the counseling center or to the counseling are never investigated toward staff / faculty misconduct and were as a result, deliberately indifferent. This includes the other incidents regarding other female students that were verified which were deliberately indifferent.

68.     Even though the University's policy mandates from all "responsible employees" to report knowledge or even suspicion of violations to the Discrimination, Harassment and Sexual

Misconduct policy, Ms. Doe's case was not reported by multiple WSU officials and faculty. The University also had a contradictory policy where only the victim could directly report the misconduct to the University. This made it so other victims and other possible work-place investigations could not have other individuals report misconduct on their behalf, including reports from a local newspaper. The University had a policy and "quid pro quo" that deterred individuals and faculty to report observed harassment from faculty toward students. The University wanted Ms. Doe, in her emotional state, to feel, "empowered" to report the incident on her own. The issues regarding Ms. Doe and other female students should have been reported to the University in 2014 and 2015 from Ms. Knapp and Mr. Amsel. They should have been reported by Mr. Ashley in 2017. The Title IX office became aware in 2018 and did not initiate an investigation when it learned of Ms. Doe's fears of retaliation. They did not honor Ms. Doe's request for her student records to be locked. The failure to do so indicates that the University tolerates such behavior and condemns reports of such behavior in relation to faculty.

69.     The policy also indicates that the University does not take work-place misconduct and disciplinary investigations seriously as it relates to its faculty and staff. No disciplinary actions were made against Doctor Baird as to the past issues in the counseling center, with other students, with other patients and with other publicly reported misconduct. Doctor Baird was also formally warned of the boundaries concerns in 2004 but no record of the incident was in his employment record. Ms. Abel shared with Ms. Knapp the 2004 "mindfulness" incident in which Doctor Baird touched a female student patient while he worked at the counseling center. Ms. Abel acknowledged that she documented the 2004 incident years after it happened. Even though Ms. Abel claimed she had no knowledge of other inappropriate behavior from Doctor Baird while he was under his supervision, two counselors from the counseling center dispute this assertion. Doctor Baird's

employment file was never produced. These prior incidents were also not used or investigated and made part of Doctor Baird's employment record of events in the counseling and instead were "separate" complaints "unrelated" to his employment record.

70.     This made it so at the time the incident of Ms. Doe was finally reported, it made it appear as if this was a "isolated" incident and was not a bigger pattern of severe and pervasive misconduct toward female patients and employees. Other incidents concerning students were raised to his supervisor Eric Amsel, and they were never sent to additional authorities for investigation. Other faculty were also aware of severe and pervasive harassment through Ms. Knapp and the University never investigated those issues. The University never investigated the issue when Ms. Knapp filed a complaint to DOPL.

### ii. Conflict of interest

71.     The University was also aware of the conflict of interest in relation to the patient, student conflict. The University had no policies that did not condone the behavior except for disclosure and failed to properly train its faculty as to conflicts. Utah law clearly indicates that any conflict of interest requires termination. (See Utah Code Section 67-16-9[2] (cited by University policy PPM 3-36)) The University also did not have policies as to regulate the amount of time Professors needed between their public practices and Professional duties to the University. The indifference to these policies created the environment that Ms. Doe was subject to and did not realize the inappropriate actions as to conflicts until December of 2017.

72.     The University also decided not to terminate Doctor Baird initially despite these violations. The policies and regulations of ethics regarding counselors clearly indicate that amorous relationships between students and patients are prohibited. It also indicates that it is prohibited for

---

[2] No public officer or public employee shall have personal investments in any business entity which will create a substantial conflict between his private interests and his public duties.

a Professor to have a client and student or former client or former student as a client. *(See Utah Admin. R156-60c-502)[3] (See also The American Mental Health Counselors Association (AMHCA) code of ethics)[4]*

73.     Doctor Baird was also required to report the conflict on his own to DOPL which he never did. Also, nothing was done to fix the conflict when Doctor Baird first reported to faculty and his supervisor, Mr. Amsel, never reported the conflict to the dean or to the Title IX office. Mr. Amsel was not only the psychology department chair, he was also the WSU's due process officer and had ample knowledge of university policy.  His supervisor also indicated there were other complaints made from other students as well. There were no official complaints however. His supervisor also

---

[3] (5) failing to establish and maintain appropriate professional boundaries with a client or former client;

(6) engaging in dual or multiple relationships with a client or former client in which there is a risk of exploitation or potential harm to the client;

(7) engaging in sexual activities or sexual contact with a client with or without client consent;

(8) engaging in sexual activities or sexual contact with a former client within two years of documented termination of services;

(9) engaging in sexual activities or sexual contact at any time with a former client who is especially vulnerable or susceptible to being disadvantaged because of the client's personal history, current mental status, or any condition which could reasonably be expected to place the client at a disadvantage recognizing the power imbalance which exists or may exist between the counselor and the client;

(11) engaging in physical contact with a client when there is a risk of exploitation or potential harm to the client resulting from the contact;

(12) engaging in or aiding or abetting sexual harassment or any conduct which is exploitive or abusive with respect to a student, trainee, employee, or colleague with whom the licensee has supervisory or management responsibility;

(14) exploiting a client for personal gain;

[4] a) Romantic or sexual relationships with clients are strictly prohibited. Mental health counselors do not counsel persons with whom they have had a previous sexual relationship. b) Mental health counselors are strongly discouraged from engaging in romantic or sexual relationships with former clients. Counselors may not enter into an intimate relationship until five years post termination or longer as specified by state regulations. Documentation of supervision or consultation for exploring the risk of exploitation is strongly encouraged.

j) To a safe environment for counseling free of emotional, physical, or sexual abuse.

l) Are aware of the intimacy of the counseling relationship, maintain a healthy respect for the integrity of the client, and avoid engaging in activities that seek to meet the mental health counselor's personal needs at the expense of the client.

b) Mental health counselors do not condone or engage in sexual harassment, or violate the provisions of state or federal laws, prohibiting sexual harassment.

f) Mental health counselors provide an appropriate assessment environment with regard to temperature, privacy, comfort, and freedom from distractions.

2. Mental health counselors do not engage in ongoing counseling relationships with current supervisees, students or employees. 3. All forms of sexual behavior with supervisees, students or employees are unethical. 4. Mental health counselors do not engage in any form of harassment of supervisees, students, employees or colleagues.

1. Mental health counselors recognize the influential position they have with regard to both current and former supervisees, students and employees, and avoid exploiting their trust and dependency.

i) Dual Relationships Supervisors will avoid all dual relationships that may interfere with the supervisor's professional judgment or exploit the supervisee. Any sexual, romantic, or intimate relationship is considered to be a violation. Sexual relationship means sexual conduct, sexual harassment, or sexual bias toward a supervisee by a supervisor.

indicated that there was no discussion with Doctor Baird regarding this incident until the University investigation commenced. Doctor Baird was also required to report amorous relationships to his supervisors which he never did.

74. The conflict made it so Ms. Doe had to have discussions with Doctor Baird as to his ethics during class and after class. Doctor Baird was also aware of Ms. Doe's physical ailments and Ms. Doe was forced to respond to essay questions as it related to her own issues and Ms. Doe had to respond to essay questions as to the conflicts she had to Doctor Baird and personally confront Doctor Baird. The conflict caused Ms. Doe to skip the remainder of one of her classes with Doctor Baird and deprived of the program when she had to stop attending that class. Doctor Baird was aware of the susceptibility of Ms. Doe and used it against her in front of her peers.

75. The conflict also made it to where during part of the investigation, Doctor Baird and his responses used Ms. Doe's mental trauma against her to claim she was not stable as well as to claim she was having an intimate affair with another individual which was false. The claims were retaliatory against Ms. Doe and her claims; and severe and pervasive in light of the history of the issues. Also during the investigation, Ms. Doe had classes on ethics where individuals from University Public Relations would do presentations on how they "averted" a Public Relations issue related to sexual harassment and Ms. Doe had to leave the presentation. The situation as a result affected Ms. Doe and her right to educational opportunities and benefits.

76. Ms. Doe was also working with a reporter with the Salt Lake Tribune who was later hired by Weber State University as a professor which due to the conflict, made it so the reporter had to stop the investigation and the story.

### iii. Title IX - AA/EO indifference to discrimination and harassment

77. The interaction Ms. Doe had initially with the Title IX office deterred her and gave her

such a negative experience from her past issues that she did not want to self-report the incident to the Title IX officer. Even though Ms. Doe was encouraged to speak to the new Title IX deputy, Aaron Garza, she was further discouraged by the lack of action from that office, and shows that their office was deliberately indifferent to complaints of discrimination and eventually the complaint of Ms. Doe. The issue of which required the University to obtain an independent investigator.

78.     Ms. Doe specifically requested from the Title IX office in 2018 to place a lock on her records. Mr. Garza told her he would find out a way to do so and said he would call her. Ms. Doe never received a follow up call from the Title IX office and her records were not locked to those without a legitimate educational purpose. Doctor Baird obtained access to Ms. Doe's student records to retaliate against her because the University was deliberately indifferent and did not comply with Family Educational Rights and Privacy Act (FERPA) laws[5].

79.     There was also indifference on the Title IX Executive Director Mr. Gomberg's part by refusing to accept testimony from Ms. Doe's former advisor. Since he was not in charge of the investigation, he should have referred the advisor to Ms. Leonard and he neglected to do so.

**iv. Indifference to their own internal investigation and Ogden Police's Investigation**

80.     The University was also aware of the complaint made to the Ogden City Police in March of 2018 as early as April of 2018. Instead of conducting their own investigation at that time, instead of placing Doctor Baird on administrative leave during the investigation, the University did not open its own investigation until January of 2019. Doctor Baird was not placed on administrative leave at that time which showed the University's indifference to school harassment, neither was

---

[5]   34 **CFR** § **99.31**(a)(1)(ii): "An educational agency or institution must use reasonable methods to ensure that school officials obtain access to only those education records in which they have legitimate educational interests. An educational agency or institution that does not use physical or technological access controls must ensure that its administrative policy for controlling access to education records is effective and that it remains in compliance with the legitimate educational interest requirement in paragraph (a)(1)(i)(A) of this section."

he during the investigation.

81.     Due to the University's failure to follow through in locking Ms. Doe's student records and thus preventing Doctor Baird from accessing those records, as well as its failure to place Doctor Baird on administrative leave, Doctor Baird was able to download Ms. Doe's homework assignments and profile picture to retaliate against her with false claims regarding her mental state and personality. Doctor Baird's violations of FERPA law were enabled by the University's failure to prevent him access to Ms. Doe's records.

82.     The University also did not allow Ogden City Police to interview Diana Abel and potentially other individuals as it related to Ms. Doe's claims. This raises concerns as to the University hampering a criminal investigation so as not to expose their own liability as the University knew or should have known that both Ms. Knapp and Ms. Abel knew about the incident as early as 2015 and Ms. Abel was directed not to speak. The independent investigator was also not allowed to interview the additional individuals and faculty and students. Instead, the investigation was conducted by Morris Haggerty, Assistant Attorney General staffed at Weber State University. The obstruction of the Ogden City Police's investigation also indicates deliberate indifference of workplace harassment on the University.

83.     Also, Mr. Haggerty's indifference and disregard to the statements and claims made by Ms. Knapp and failure to interview Craig Oreshnick and Ms. Wood and verify their statements and add them to the investigation report showed indifference to workplace harassment. Based upon information or belief, Ms. Knapp was also employed with Weber State during that time despite claims to the contrary.

84.     Based on information or belief, the University did not want Ms. Knapp to talk to Ms. Abel to corroborate statements that they were both aware of the incident as early as 2015. The University

advised Ms. Abel not to confirm with Ms. Doe that she was aware of the situation. The course enrollment indicates that Ms. Knapp was employed by Weber State during and after the issuance of the police report. Ms. Knapp's allegations were essential to the investigation of Weber State and her statements as to additional perverse sexual harassment from other students and faculty. Instead, her statements were discredited or not relied on only because she could not be contacted.

85.     The only person interviewed, Dianna Abel and her statements, also conflicts with the statements of the other individuals. There are concerns of a conflict of interest as to the investigation of Mr. Haggerty and his impartiality and his advisement and or his colleagues advisement of which he was aware or should have known to Ms. Abel prior, given that Ms. Abel was aware of the statements that Ms. Knapp had made regarding Doctor Baird and his conduct toward females. Mr. Haggerty also down-played and undermined other complaints and issues of an ongoing pattern of harassment toward females and claimed they were unsubstantiated. Mr. Haggerty also neglected to fully investigate the issues pertaining to other female students and avoided asking direct questions regarding Doctor Baird's reported of misconduct.

**v. Deliberate indifference as to the decision to discipline.**

86.     The initial decision to place Doctor Baird on leave for one year without pay also had no indication or promise or assurance toward Ms. Doe and to other females that this kind of conduct would cease in the classroom and toward students. This showed a deliberate indifference toward Ms. Doe and other females and their sense of security in an educational environment. The decision also overlooked the fact on whether or not criminal charges would have been filed and could have been filed against Doctor Baird but-for the statute of limitations and that the actions were still potentially criminal violations toward a student.

**vi. The policies forces victims to prosecute the University's own faculty for disciplinary action.**

87.     Also, the policies and procedures forced Ms. Doe to not only personally report Doctor Baird, it also forced Ms. Doe to prosecute and prove additional disciplinary action was needed of the University's own professor on the University's behalf and at the expense of Ms. Doe. This also included additional facts and complaints that were not part of Ms. Doe's issues. The ultimate decision of the Provost indicates deliberate indifference to harassment in light of the final decision of the University's Faculty Board of Review from January 8th, 2020 to terminate Doctor Baird. There was also no additional disciplinary investigation or action for the incident alleged with the minor in January of 2018. Also, according to University policy, if the patient does not file a formal charge with the Faculty Board of Review, it won't be prosecuted within the University.

88.     Ms. Leonard's both draft and final reports dated March 29th and May 2nd, 2019 indicated "This investigation concluded that Baird violated Weber State's policy against discrimination and harassment. Specifically, Baird engaged in unwelcome, severe sexually- oriented conduct towards Ms. ███████ and his behavior created a hostile learning environment for Ms. ███████ The investigation also concluded that Baird violated WSU's conflict of interest policy; and university stationery policy." She also added: "Baird was not honest or forthcoming in this investigation. Baird also attempted to put all blame on Ms. ███████. A relevant decision regarding appropriate sanctions is Baird's continuing dishonesty with the University. Going forward, Weber State is now on notice that Baird has been willing to violate the professional boundaries that are designed to protect students from being exploited." Although the University was put on notice in March and then May 2019, the University's Provost did not promptly address and remedy the situation. The additional supplemental investigation was not conducted in a timely manner and it only prolonged the stress, misery and mental anguish Ms. Doe had been undergoing. Thereafter, Ms. Doe had to endure embarrassment, degradation, and humiliation during the formal hearing before the

University's Faculty Board of Review because of the University's deliberate indifference.

**vii. Damages**

89.     Due to the hostile learning environment and sexual harassment that Ms. Doe was subject

to and the University's deliberate indifference toward it, Ms. Doe suffered from actual damages

from battery related to the unlawful touching.

90.     Ms. Doe suffered from medical expenses past and future for the emotional trauma she

experienced as a result of the situation from Doctor Baird and the University's indifference toward

it and the process she had to go through.

91.     Ms. Doe has suffered from loss of enjoyment of life as a result of the situation as it relates

to activities she used to enjoy prior to this incident. Ms. Doe suffered from pain and suffering past

and future, including the failure to remedy the situation she originally saw Doctor Baird for as well

as exacerbating other conditions Ms. Doe was suffering at that time. Ms. Doe has suffered from

additional mental trauma that will affect her the rest of her life that needs to be treated. *Franklin

v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 66, 76 (1992).

92.     Ms. Doe has also suffered from lost wages and benefits due to her condition and

experience.

93.     Ms Doe also seeks the difference of the fair market value of an education but for the sexual

harassment she had to endure during her educational experience.

94.     Ms. Doe also seeks recovery of attorney fees and costs as a result of this incident and

situation as well as expert fees.  42 U.S.C.A. § 1988 (b).

95.     Ms. Doe also seeks exemplary damages to deter future misconduct of the school and to

deter future misconduct as a result of the deliberate indifference described in this complaint to the

extent authorized.

96.     For a cease and desist letter to the University to stop all discriminatory conduct.

97.     For the University to promptly, impartially and consistently handle discrimination, harassment and sexual assault investigations.

98.     For a cease and desist letter to the University to stop its violations of state and federal laws (GRAMA, FERPA and HIPPA).

99.     For the University to revise its policies and procedures as it relates to conflicts of interest, private businesses, complaints of harassment and how they are handled and reported, employment records and how they are handled and reported as it pertains to complaints from areas such as from the counseling center and complaints from the general public.

WHEREFORE, Ms. Doe requests the following relief in this manner:

100.    For judgment in favor of Ms. Doe based on a preponderance of the evidence of liability toward the University.

101.    For damages reasonably calculated to be proven at trial.

102.    For an empaneled jury trial to determine liability and damages.

103.    Another other relief the court would deem appropriate under these circumstances.


Submitted this 4th day of May, 2020


/s/ Brian K. Jackson
_____
Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Plaintiff