IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>vs.<br><br>WEBER STATE UNIVERSITY,<br><br>Defendant. | ORDER AND MEMORANDUM DECISION<br><br>Case No. 1:20-cv-00054-TC<br><br>Judge Tena Campbell |

Plaintiff Jane Doe brought this lawsuit against Defendant Weber State University (the University) for violation of Title IX of the Education Amendments of 1972. Ms. Doe, a former student at the University, alleges that Professor Todd Baird sexually harassed her during private counseling sessions. The University now moves to dismiss Ms. Doe's Title IX claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons described, Ms. Doe has asserted a plausible claim for relief under Title IX, and the University's motion (ECF No. 7) is denied.

## FACTUAL ALLEGATIONS[1]

### I. Dr. Baird behaves inappropriately toward Ms. Doe during counseling sessions.

Ms. Doe was a student at the University from 2009–2014 and 2016–2019. Dr. Baird, a professor in the University's psychology department, approached Ms. Doe on campus to offer

---

[1] All factual allegations are from Ms. Doe's complaint. The court accepts them as true for the purposes of this order alone. See Albers v. Bd. of Cty. Comm'rs of Jefferson Cty, 771 F.3d 697, 700 (10th Cir. 2014).

1

her private psychological counseling services. Ms. Doe began attending counseling sessions with Dr. Baird in the spring of 2013. During these sessions, Dr. Baird touched Ms. Doe's ribcage as part of "therapeutic exercises." Compl. at 3 ¶ 9 (ECF No. 2). He also made inappropriate comments, such as inviting Ms. Doe to swim naked with him and disclosing personal information about other patients.

At Dr. Baird's suggestion, Ms. Doe enrolled in one of Dr. Baird's psychology courses in the spring of 2014. Dr. Baird said that his supervisor, the vice provost, approved Ms. Doe's enrollment in Dr. Baird's class even though Ms. Doe was Dr. Baird's private patient. Ms. Doe ultimately stopped attending Dr. Baird's class, but she continued to receive Dr. Baird's counseling.

As the counseling sessions continued, Dr. Baird began hugging Ms. Doe and touching her intimately during "mindfulness" exercises. Id. at 3 ¶ 12. One day, Dr. Baird massaged Ms. Doe's gluteal area and asked if she had orgasmed. When Ms. Doe later confronted Dr. Baird about his behavior and told him "she felt used," Dr. Baird said, "he could say Ms. Doe was a slut" and "he was like a narcissist playing with his toy." Id. at 4 ¶ 13. Ms. Doe terminated therapy with Dr. Baird on May 7, 2015.

II.     **Ms. Doe tells University staff about Dr. Baird's inappropriate conduct.**

In May of 2015, Ms. Doe told Jaclyn Knapp, a colleague of Dr. Baird and member of the University's psychology department, about Dr. Baird's inappropriate behavior. Id. at 4 ¶ 14. Ms. Knapp indicated that Dr. Baird had been inappropriate with other students and that she and Dianna Abel, director of University counseling services, were worried about Dr. Baird's pattern of behavior.

2

Ms. Knapp later reached out to Dr. Abel about the situation between Ms. Doe and Dr. Baird. Dr. Abel knew that it regarded sexual behavior and she expressed her disappointment with Dr. Baird. Id. at 4 ¶ 14–15. Dr. Abel is member of the University's Strategic Threat Assessment and Response team (STAR). The STAR team "evaluates potential safety threats to the members of the Weber State University community in an effort to help the campus be a safe and secure working and learning environment in accordance with [University policy.]" Id. at 4 ¶ 16. The team "works to identify and assess potential threats and makes recommendations to reduce or eliminate those threats." Id. Neither Dr. Abel nor Ms. Knapp was required to keep Ms. Doe's statements about Dr. Baird confidential.

### III.    Ms. Doe returns to therapy with Dr. Baird.

In the fall of 2015, Ms. Doe was diagnosed with breast cancer. She returned to Dr. Baird for counseling related to her pain. Dr. Baird joked that Ms. Doe would get a "boob job" out of her breast cancer, asked to see naked photos of her, and wondered if Ms. Doe felt like a "prostitute when she had fake eyebrows drawn on her." Id. at 5 ¶ 17. Dr. Baird also "grabbed" Ms. Doe's thighs and placed his hands on her belly. Id. He touched her breasts several times. Ms. Doe terminated therapy for a second time in July of 2016.

The next semester, Ms. Doe ended up enrolled in another University class taught by Dr. Baird, even though she tried to take the class with another faculty member. Ms. Doe confronted Dr. Baird about his "counseling techniques and ethics" in December of 2017, and in response Dr. Baird offered to have another professor grade Ms. Doe's coursework. Id. at 5 ¶ 21.

### IV.    Ms. Doe reports Dr. Baird's conduct to various authorities.

Ms. Doe told the University counseling center about Dr. Baird's inappropriate conduct in December of 2017. She was informed that she needed to file a formal complaint with the Title IX

office and that one could not be filed on her behalf. Ms. Doe did not want to work with the Title IX office based on earlier negative experiences she had with the office's executive director.[2]

Ms. Doe also reported Dr. Baird's conduct to ecclesiastical authorities in the Church of Jesus Christ of Latter-Day Saints[3] and to the Utah Department of Occupational Licensing (DOPL). She told Ms. Knapp that DOPL might call Ms. Knapp to discuss Dr. Baird's behavior. Ms. Knapp agreed and said that DOPL should also call Dr. Abel who had more information about Dr. Baird. Id. at 6 ¶ 23. Additionally, Ms. Doe filed a police report with the Ogden police department in March of 2018.

### V. The University launches a Title IX investigation.

Ms. Doe prepared a formal Title IX complaint in December of 2018 after the University brought in a neutral, third-party investigator from the Utah Attorney General's Office. Ms. Doe alleges that around this time, Dr. Baird improperly accessed her student records to provide "evidence" against her as part of the Title IX investigation. Id. at 8 ¶ 35.

The Title IX report, issued on May 2, 2019, concluded that Dr. Baird's conduct toward Ms. Doe was more than likely unwelcome and severe. Dr. Baird "was responsible for the ensuing hostile environment Doe experienced" and "this conduct constitutes a violation of Weber State's [discrimination and harassment policies]." Id. at 9 ¶ 36.

After reviewing the Title IX report, University Provost Madonne Miner requested a supplemental investigation, which was completed on August 9, 2019. Provost Miner

---

[2] Ms. Doe had previously interacted with the Title IX office in 2011 when she perceived one of her professor's comments as an insult to her Mexican ethnic origin. Compl. at 2 ¶ 6. The office's executive director implied that Ms. Doe "made a big deal out of nothing" and was "playing the 'race' card." Id. Ms. Doe alleges that she had such a negative experience at the Title IX office "that she would never go back there." Id. at 2 ¶ 7.

[3] Dr. Baird held a position of authority within a local congregation of the LDS church. Id. at 2 ¶ 8.

subsequently issued a memorandum explaining that Dr. Baird had engaged in an amorous relationship with Ms. Doe[4] which "presented barriers to her full participation in coursework offered by the University." Id. at 13 ¶ 50. The memorandum also stated that Dr. Baird shared confidential information about other students and created conflicts of interest "among his roles as faculty member, therapist, and human being engaged in an amorous relationship with a student and client." Id.

Provost Miner recommended that Dr. Baird be placed on leave without pay for one year. Ms. Doe disagreed with Provost Miner's punishment of Dr. Baird. She filed a formal charge against Dr. Baird with the Faculty Board of Review. The Faculty Board of Review ultimately found Provost Miner's recommendation insufficient and required that Dr. Baird's employment be terminated.

### VI. Dr. Baird's inappropriate conduct toward other students.

Ms. Doe alleges that Dr. Baird behaved inappropriately with other patients and University students on numerous occasions, both before and after she saw him for therapy. Some of her allegations are based on information discovered during the Title IX investigation, and others come from the Ogden police report.

The Title IX report includes the following allegations against Dr. Baird, although the report states that they could not be verified: In 2004, the father of a female student complained that Dr. Baird, who was then working at the University counseling center, touched the student

---

[4] As part of the investigation, Dr. Baird admitted that his therapeutic relationship with Ms. Baird got "too close." He said "[w]as our relationship –was it –did it meet all the standards? No. It didn't . . . [a]nd when—when I—when we felt those feelings . . . there should have never been physical contact ever again. There should have never been." In referring to Ms. Doe, he said, "I remember hugging you. I remember there were feelings of arousal for both of us . . . I remember there was [sic] a few hugs that were —that they felt sexual. They felt inappropriate. I admit that. You're right. And—and I'm sorry." Id. at 13 ¶ 50.

5

inappropriately during therapy. Dr. Abel knew about this incident and Dr. Baird was "warned of the boundaries concern," but Dr. Baird was not formally investigated or disciplined. Id. at 17 ¶ 67; 18 ¶ 69. Another student noted that Dr. Baird "exploited the power differential between students and professors and [played] inappropriate mind games." Id. at 10 ¶ 39. In December of 2018, a juvenile female reported that Dr. Baird was inappropriate toward her in therapy. The Title IX report indicated that these incidents demonstrated a pattern of "predation" on patients. Id.

The Ogden police report also describes past instances of Dr. Baird's inappropriate behavior. Ms. Knapp told the Ogden police that "Dr. Baird would inappropriately touch the female students." Id. at 10 ¶ 40. He said "dirty things 'just to get a rise out of the girls and make them feel uncomfortable.'" Id. (quoting Opp'n Br. Ex. 2 (ECF No. 10-2)). Dr. Baird had been in a relationship with another female student in the past and he told Ms. Knapp "that Trish was leaving underwear for him and that she was really after him." Id. at 10 ¶ 41. During a University research trip, Dr. Baird offered to share a room with another female student. The Ogden police report also contained a complaint from a man who said he was under Dr. Baird's care as a teenager. The man contacted the University's human resources office in 2012 and accused Dr. Baird of abusing him for seven months.

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff's complaint "must plead facts sufficient to state a claim to relief that is plausible on its face." Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (internal punctuation omitted) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is facially plausible when the complaint contains factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct

alleged. Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013). The court must accept all well-pleaded allegations in the complaint as true and construe them in the light most favorable to the plaintiff. Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., 771 F.3d 697, 700 (10th Cir. 2014). The court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Sutton v. Utah Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991).

## ANALYSIS

Ms. Doe brings one cause of action against the University: violation of Title IX of the Education Amendments of 1972.[5] Title IX mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Sexual harassment is a form of discrimination under Title IX. Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 649–50 (1999). A university that receives federal funding may be held liable for damages caused by its deliberate indifference to the sexual harassment of a student that is so severe, pervasive, and objectively offensive that it deprives the victim of equal access to educational resources, opportunities, or benefits.[6] Id. at 650.

---

[5] The court views Ms. Doe's complaint as setting forth one cause of action. Though her complaint presents six "legal allegations" under different subheadings, the court considers these to be theories of liability under her single Title IX claim and not separate causes of action. See Compl. at 14–26.

[6] Congress abrogated states' Eleventh Amendment immunity under Title IX. Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 72 (1992). Accordingly, a public university may be sued by its students for Title IX violations. Id.

To state a claim under Title IX, Ms. Doe must allege that the University (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived Ms. Doe of access to the educational benefits or opportunities provided by the school. Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1246 (10th Cir. 1999). For the following reasons, Ms. Doe has properly alleged all four elements of her Title IX claim.

## I. Ms. Doe sufficiently alleges actual knowledge.

A university is only liable for its actual knowledge about harassment, not for what it "should have known." Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170, 1175 (10th Cir. 2007) (internal quotations and citations omitted). Actual knowledge must be held by an "appropriate person," who is, at minimum, "an official of the university with authority to take corrective action on behalf of the university to end the discrimination." Ross v. Univ. of Tulsa, 859 F.3d 1280, 1283 (10th Cir. 2017) (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998). "Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry." Murrell, 186 F.3d at 1247.

Ms. Doe alleges that she told Ms. Knapp about Dr. Baird's conduct in May of 2015. The complaint does not describe the extent to which Ms. Knapp had authority to take corrective action against Dr. Baird. But Ms. Doe also claims that in 2015, Ms. Knapp told Dr. Abel about Dr. Baird's harassment of Ms. Doe. Dr. Abel was specifically given the task of addressing safety threats to the University community as a member of the STAR team. The court can reasonably infer that Dr. Abel's position on the STAR team gave her the authority to take corrective action against Dr. Baird's behavior.

Title IX's actual knowledge prong can also be satisfied if other students' earlier complaints about a university employee put the university on notice that the employee posed "a substantial risk of abuse." Escue v. N. OK Coll., 450 F.3d 1146, 1154 (10th Cir. 2006) (internal citations omitted). Earlier instances of harassment "need not be clearly credible" because at some point, a supervisory official knows that a university employee is creating a substantial risk to students. Id. (internal citations omitted).

Here, the court can infer that the University was on notice that Dr. Baird presented a substantial risk of abuse to students. Ms. Doe alleges that Ms. Knapp and Dr. Abel were aware that Dr. Baird behaved sexually toward other students. And long before Ms. Doe began attending therapy with Dr. Baird, the University received complaints in 2004 and 2012 about Dr. Baird's sexual and abusive behavior toward patients, one of whom was also a student. Dr. Abel knew about the 2004 incident and the human resources office knew about the 2012 incident.

The University argues that all of these earlier reports are too vague and temporally distant to provide the University with actual notice of Dr. Baird's harassment. But when the reports are considered together, they indicate that Dr. Baird exhibited a pattern of harassment that was known by, at the very least, Dr. Abel, Ms. Knapp, and the human resources office. The court is particularly persuaded by the allegation that Dr. Abel—an appropriate person—was aware of Dr. Baird's sexual behavior toward other students before she learned that he was harassing Ms. Doe.

The court can infer that the University had actual knowledge that Dr. Baird harassed both Ms. Doe and other students in the past. Accordingly, Ms. Doe has adequately pled Title IX's actual knowledge requirement.

**II.      Ms. Doe sufficiently alleges deliberate indifference.**

A university is deliberately indifferent to acts of harassment when "the [University's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. A response is unreasonable when it, "at a minimum, cause[s] students to undergo harassment or make them liable or vulnerable to it." Id. at 645 (quotation marks and citations omitted); see also Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1122 (10th Cir. 2008) ("A school cannot learn about a problem and do nothing.") But the deliberate indifference element does not require university administrators to engage in a particular disciplinary action, nor does it give victims the right to demand a particular remedy. Escue, 450 F.3d at 1155.

Ms. Doe claims that the University was deliberately indifferent in numerous ways, including: 1) when it took no action after Ms. Doe first voiced her concerns to Ms. Knapp in 2015; 2) when it refused to take action until Ms. Doe filed formal complaint with the Title IX office; 3) when it failed to interview certain witnesses during its Title IX investigation; 4) when it initially punished Dr. Baird with only a one-year suspension; and 5) when it failed to train faculty or implement policies to prevent conflicts of interest like the one between Ms. Doe and Dr. Baird.

Only one of Ms. Doe's allegations is sufficient to support a cognizable deliberate indifference claim: it is plausible that the University was deliberately indifferent when it took no action after Dr. Abel, through Ms. Knapp, initially learned of Dr. Baird's sexual behavior toward Ms. Doe. When Ms. Doe first voiced her concerns about Dr. Baird to Ms. Knapp in 2015, both Ms. Knapp and Dr. Abel were aware of Dr. Baird's sexual behavior toward other students. But no action was taken until 2018, after Ms. Doe again reported misconduct by Dr. Baird to the University counseling center. Between 2015 and 2018, Ms. Doe suffered further harassment by

Dr. Baird, as did another female student who complained about his behavior in 2018. Ms. Doe's complaint is sufficient in showing that the University's lack of action, in light of what Dr. Abel and Ms. Knapp knew, was unreasonable. The University did nothing, which allowed Dr. Baird to continue harassing Ms. Doe and at least one other student.

But Ms. Doe's other allegations of deliberate indifference are inadequate. She provides no facts suggesting that the University was unreasonable in directing Ms. Doe to file a complaint with the Title IX office. Additionally, Title IX does not give Ms. Doe the right to decide how the University should have conducted its investigation nor how it should have punished Dr. Baird. Ms. Doe has not sufficiently stated why the University's remedial and disciplinary procedures were unreasonable.

Ms. Doe also alleges that the University acted with deliberate indifference in violation of Title IX when it failed to implement a conflicts-of-interest policy. Ms. Doe argues that Dr. Baird's employment would have been terminated had the University properly trained its faculty members about avoiding conflicts of interests. But Ms. Doe's conflict-of-interest argument is not cognizable under Title IX; she provides no facts suggesting that the alleged conflict of interest caused her to be sexually harassed by Dr. Baird. In sum, Ms. Doe has sufficiently alleged deliberate indifference, but only in regard to the University's lack of action after it learned of Dr. Baird's harassment in 2015.

## CONCLUSION

The University does not argue that Ms. Doe has failed to adequately plead the third and fourth elements of her Title IX claim. See Rost, 511 F.3d at 1119 ("(3) harassment that is so severe, pervasive and objectively offensive as to (4) deprive access to the educational benefits or

opportunities provided by the school.") The court finds that she has alleged these elements properly.

For the foregoing reasons, Plaintiff Jane Doe has stated a plausible claim for relief under Title IX. Defendant Weber State University's motion to dismiss (ECF No. 7) is DENIED.

DATED this 5th day of January, 2021.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge