IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| ARELI THOMAS,<br><br>    Plaintiff,<br><br>v.<br><br>WEBER STATE UNIVERSITY,<br><br>    Defendant. | **ORDER AND MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 1:20-cv-00054-TC-DAO<br><br>Judge Tena Campbell<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Areli Thomas filed this action against Defendant Weber State University (WSU) on May 4, 2020.  Ms. Thomas sought damages and injunctive relief for sexual harassment she experienced as a private therapy patient of former WSU psychology professor Dr. Todd Baird.  Ms. Thomas alleged that WSU's deliberate indifference to Dr. Baird's harassment of her and others subjected her to harassment in violation of Title IX of the Education Amendments Act of 1972 (Title IX).  Ms. Thomas initially alleged multiple theories of liability against WSU, but the court narrowed Ms. Thomas's case when it held that Ms. Thomas sufficiently alleged deliberate indifference only regarding WSU's lack of action after staff members learned about Dr. Baird's harassment of Ms. Thomas in May 2015.  (See Order & Mem. Decision on Mot. to Dismiss, ECF No. 18 at 11.)

Ms. Thomas and WSU have moved for summary judgment.  (See Thomas Mot. for Summ. J., ECF No. 145; see WSU Mot. for Summ. J., ECF No. 114.)  For the reasons stated below, the court denies Ms. Thomas's motion and grants WSU's motion.

## FACTUAL BACKGROUND

Ms. Thomas attended WSU from fall 2009 to spring 2014 for her undergraduate degree and from fall 2016 to spring 2019 for a master's degree.  (Pl.'s Resps. to Def.'s First Set of Disc. Reqs. and Reqs. for Admiss., ECF No. 144-5 at 37; Dep. Areli Thomas, ECF No. 114-4 at 14:2.) She worked for WSU's multicultural center from August 2014 through sometime in April 2016. (See ECF No. 144-5 at 37.)

### I.       First Round of Private Therapy Sessions with Dr. Baird

In April 2013, WSU psychology professor Dr. Baird[1] approached Ms. Thomas as she was walking on campus and offered her counseling services through his private practice.  (See ECF No. 114-4 at 16:4–12; see also Decl. Madonne Miner, ECF No. 114-6 at ¶¶ 7–10 (stating that Dr. Baird's private practice is entirely unaffiliated with WSU).)  Shortly after, Ms. Thomas began seeing Dr. Baird for counseling sessions at his off-campus office.  (ECF No. 114-4 at 16:24– 17:2.)  Though he was not her professor at the time, Dr. Baird also provided Ms. Thomas with access to online portal materials for a psychology class and invited her to use his office and computer to study.  (See Ashley Leonard Meeting Notes dated Jan. 11, 2019, ECF No. 144-6 at 1.)  Ms. Thomas further alleges that Dr. Baird continuously asked her questions about whether she had feelings for anyone other than her husband, and he would tell Ms. Thomas about feelings he had for someone other than his wife.  (Id.)

The first round of therapy sessions between Ms. Thomas and Dr. Baird ended before Ms. Thomas enrolled in Dr. Baird's class in spring 2014.  (ECF No. 114-4 at 17:19–18:8.)  Then-Chairperson of WSU's Psychology Department, Eric Amsel, recalled that Dr. Baird reached out

---

[1] WSU no longer employs Dr. Baird.  (See Am. Compl., ECF No. 50 at ¶ 55 ("The Faculty Board of Review ultimately determined that the disciplinary action was not sufficient and required termination.").)

to him in 2014 about a private therapy patient of Dr. Baird's enrolling in his class.  (Eric Amsel Letter dated Mar. 19, 2019, ECF No. 144-25.)  Mr. Amsel did not know who the student was and, accordingly, did not discuss the matter with Ms. Thomas.  (See id.)  Ms. Thomas reported that she stopped attending class after Dr. Baird made fun of her in front of the class.  (ECF No. 144-6 at 1.)  As Dr. Baird's student, Ms. Thomas would chat with him in his office on campus. (See Thomas Report of Events, ECF No. 144-42 at 1.)  Ms. Thomas alleges that one day as she was telling Dr. Baird about pain she was experiencing, he, without warning, lifted her vest to look at her buttocks to "see where [her] pain was."  (ECF No. 144-6 at 1.)

## II.    Second Round of Private Therapy Sessions with Dr. Baird

After graduating with an undergraduate degree in spring 2014, Ms. Thomas resumed private therapy sessions with Dr. Baird for about a year.  (ECF No. 114-4 at 25:19–26:2.) During these sessions, Ms. Thomas alleges that Dr. Baird touched her inner thigh as part of a mindfulness exercise and asked her how aroused she felt.  (Id. 27:11–21, 28:17–29:9; see Mar. 27, 2018, Incident Rep., ECF No. 114-25.)  Dr. Baird at one point allegedly told Ms. Thomas that he could not get erections.  (ECF No. 114-4 at 31:3–6, 31:15–25.)  He also had her touch a surgery scar in his groin area.  (Id.)  He asked her to show him how she sat on her husband's lap. (Ashley Leonard Final Investigation Rep., ECF No. 144-2 at 2.)  In spring 2015, before Ms. Thomas terminated this round of sessions, Dr. Baird gave Ms. Thomas massages during sessions, among other physical contact, and asked her if she had an orgasm during one of the massages. (ECF No. 114-4 at 32:1–15.)  All these incidents occurred at Dr. Baird's off-campus office.  (Id. 32:16–19.)

### III.     Third Round of Private Therapy Sessions with Dr. Baird

Ms. Thomas resumed sessions with Dr. Baird for a third time after she was diagnosed

with breast cancer in the fall of 2015, while she was working for WSU's multicultural center.

(Id. 33:24–34:10; see ECF No. 144-5 at 37.)  This round of sessions lasted until July 2016,

before Ms. Thomas reenrolled at WSU that fall for her graduate program.  (See ECF No. 144-5

at 37.)   At some point between October 2015 and July 2016, Dr. Baird demanded Ms. Thomas

show him photos of herself.  (ECF No. 114-4 at 34:20–35:2.)  Ms. Thomas alleges that Dr. Baird

told her that she at least would get a "boob job" out of having breast cancer and that he was once

stripped naked during surgery.  (ECF No. 114-4 at 35:3–8, 35:19–36:3.)  Dr. Baird allegedly

grabbed Ms. Thomas's wrists and pinned her up against the wall during a session.  (Id. 36:4–8.)

He also told Ms. Thomas that she showed too much cleavage and looked like a prostitute, in

addition to touching her stomach and legs to assess how much weight she lost during cancer

treatments and her breast.  (Id. 36:12–37:7.)

### IV.     Ms. Thomas Tells WSU Professor Jacklyn Knapp About Her Concerns with Dr. Baird's Therapeutic Care

In May 2015, Ms. Thomas contacted WSU Adjunct Professor Jacklyn Knapp, Ms.

Thomas's former neighbor and friend, to discuss Dr. Baird's behavior during therapy sessions.

(ECF No. 114-4 at 109:10–25.)  What Ms. Thomas told Ms. Knapp is undisputed: she

specifically mentioned the mindfulness breathing exercise and a gluteal massage.  (See id.

110:21–25.)  Ms. Thomas also shared that her therapist hugged her during a session, and during

the hug he put his hand up her shirt and tugged on her pants to stimulate her genitals.  (See ECF

No. 114-4 at 110:21–24; Dep. Jacklyn Knapp, ECF No. 114-18 at 30:17–32:10.)  Ms. Thomas

chose to contact Ms. Knapp, a therapist herself, to get Ms. Knapp's opinion on Dr. Baird's

behavior.  (ECF No. 114-4 at 109:19–110:17.)  Ms. Thomas claims that as she was describing

her concerns about her therapist to Ms. Knapp, Ms. Knapp asked if Ms. Thomas was talking

about Dr. Baird.  (Id. 111:9–17.)  Ms. Knapp told Ms. Thomas that she should report her

therapist.  (Id. 113:7–8.)  After her phone call with Ms. Thomas, Ms. Knapp called the

Department of Professional Licensing (DOPL) to report Dr. Baird for his potential ethical

violations.  (See Decl. Jacklyn Knapp, ECF No. 114-16 at ¶ 7.)  But "[b]ased on the limited

information [she] was able to share, the Department did not take a formal report."  (Id. ¶ 7.)

### V.    Ms. Knapp Contacts Friend and Colleague Dr. Dianna Abel After Speaking with Ms. Thomas

After speaking with Ms. Thomas, Ms. Knapp—on her own initiative—contacted Dianna

Abel, the Director of WSU's Counseling and Psychological Services Center (CPSC) at the time,

to tell her about Ms. Thomas's concerns about Dr. Baird.  (Dep. Dianna Abel, ECF No. 114-2 at

26:18–27:14, 6:9–6:15.)  Ms. Knapp reached out to Dr. Abel to discuss the situation because

they were friends and colleagues.  (See ECF No. 114-18 at 40:18–41:2 (Ms. Knapp "wanted to

consult with a colleague because [she] wasn't sure if [Dr. Baird's actions regarding Ms. Thomas]

w[ere] reportable to the licensing department").)  On the call, it is undisputed that Ms. Knapp did

not mention Ms. Thomas by name, nor did Ms. Knapp mention that Ms. Thomas was affiliated

with WSU.  (ECF No. 114-2 at 30:1–6; see ECF No. 144 at 7–8; see also Decl. Dianna Abel,

ECF No. 114-19 at ¶ 7.)  But Ms. Knapp and Dr. Abel dispute whether Ms. Knapp told Dr. Abel

that Dr. Baird was the therapist with whom the anonymous patient had concerns.  (Compare ECF

No. 114-2 at 27:11–14, with ECF No. 114-18 at 42:18–25.)  Ultimately, Dr. Abel did not report

the contents of the call to anyone.  (ECF No. 114-2 at 29:22–25.)

Dr. Abel was Dr. Baird's supervisor at CPSC from approximately 2003 to 2005 and knew

about an incident from 2004 that involved him.  (See id. 30:7–25 ("He called me and told me that

he had just gotten off the phone with a client's father who was distressed about what his daughter

had told him had taken place in her therapy session with [Dr. Baird].”); ECF No. 114-2 at 30:18–19, 33:1–5 (stating that Dr. Baird worked at CPSC for about two years and that the 2004 incident happened “at least halfway through his time”).)  Dr. Abel consulted with her supervisor at the time, Jeffrey Hurst, about the incident.  (See Decl. Morris Haggerty, ECF No. 114-33 at ¶ 14.)

Dr. Abel was a member of WSU’s Strategic Threat Assessment and Response (STAR) team when Ms. Knapp called her to report Ms. Thomas’s concerns.  (ECF No. 114-2 at 53:22–54:2.)  The STAR team’s job is to evaluate threats on campus, try to mitigate them, and respond accordingly.  (See id. 54:4–7.)  The STAR team “provide[s] consultation” to WSU’s Affirmative Action/Equal Opportunity (AA/EO) and Title IX office on sexual harassment claims.  (Id. at 59:1–3.)  “The STAR team is not an investigative body … [and it] does not have authority to discipline students, faculty or staff.”  (Decl. Dane LeBlanc, ECF No. 114-20 at ¶¶ 12–13.)

## VI.    Revelations about Dr. Baird’s Misconduct

Because of her breast cancer diagnosis, Ms. Thomas took off the spring 2016 semester, but she returned to WSU in fall 2017 and enrolled in a class with Dr. Baird.  (ECF No. 114-4 at 19:10–16, 21:18–22:4.)  She tried to get into the same class with another professor, but it was full.  (See id. at 22:21–23:22.)  Ms. Thomas’s graduate degree did not require her to take the class.  (Id. at 22:4–6.)  During the class with Dr. Baird, Ms. Thomas realized that Dr. Baird’s actions toward her over the years were not therapeutic and were unethical.  (See ECF No. Thomas Timeline of Events, ECF No. 144-1 at 3.)  She exercised her frustration through her assignments submitted to Dr. Baird (see Assignments, ECF Nos. 144-30 & 144-31) and confronted Dr. Baird on his behavior at the end of the semester.  (See ECF No. 144-2 at 11.)  Ms. Thomas claims that Dr. Baird’s reaction to that confrontation prompted her to approach CPSC in

December 2017.  (See id. at 30; see also ECF No. 114-4 at 157:2–12.)  At that point, too, Ms. Thomas started asking classmates to walk with her to class.  (ECF No. 114-4 at 85:9–13.)

## VII.    Ms. Thomas Formally Reports Dr. Baird's Conduct

Ms. Thomas eventually reported Dr. Baird's conduct to various authorities.  She approached CPSC for crisis counseling in December 2017 and learned of her reporting options before reporting Dr. Baird to DOPL on December 31, 2017.  (See ECF No. 144-1 at 5; see ECF No. 18 at 11.)  In March 2018, Ms. Thomas filed an Ogden City Police Report.  (See Ogden Police Report, ECF No. 144-7 at 4).  WSU's Director of Public Safety learned about Ms. Thomas's charges from Ms. Thomas's police report around August 2018.  (See ECF No. 114-20 at ¶ 7.)  Ms. Thomas filed a Title IX complaint with WSU in December 2018.  (See Title IX Compl., ECF No. 114-28; see also Compl., ECF No. 2.)

## VIII.    Findings of Title IX Report

WSU appointed Ashley Leonard to conduct an independent investigation of Ms. Thomas's Title IX complaint and ultimately made several findings, including that:

1) "Baird's conduct towards [Ms. Thomas] was more than likely unwelcome.  The conduct was more than likely severe, and Baird ran the risk of creating a hostile environment if his conduct limited or denied [Ms. Thomas's] ability to participate in or benefit from WSU programs";

2) "Baird's entanglement of treating a WSU student for private therapy, then assenting to the student taking WSU classes from him, created a conflict of interest";

3) "Baird violated Weber State's polic[ies] against discrimination and harassment"; 4) "it is more likely than not that Dr. Baird had an amorous relationship with Ms. [Thomas], a relationship that presents a clear conflict of interest with his role as therapist and faculty member"; and

5) "[Doctor Baird] [e]xploited the power differential between students and professors and

play[ed] inappropriate mind games" and that "incidents with counseling demonstrated a pattern of predation on … patients."  (Settlement Evaluation Review, ECF No. 114-15 at 4–5.)

## PROCEDURAL BACKGROUND

Ms. Thomas brought her original complaint in this court against WSU on May 4, 2020, under a pseudonym ("Jane Doe").  (See ECF No. 2.)  Ms. Thomas asserted several theories of Title IX liability against WSU.  (See id.)  Specifically, Ms. Thomas alleged that WSU was liable for: 1) taking no action after Ms. Thomas first voiced her concerns about Dr. Baird to Ms. Knapp in 2015; 2) failing to take action after Ms. Thomas attended crisis counseling at WSU's counseling center in December 2017; 3) the inadequacy of its actions during the Title IX investigation it conducted after Ms. Thomas filed her formal complaint in 2018; 4) its decision to punish Dr. Baird with only a one-year suspension; and 5) failing to train faculty or implement policies to prevent conflicts of interest presented by a WSU professor's private therapy practice. (See ECF No. 18 at 10.)

Shortly after, WSU filed a motion to dismiss Ms. Thomas's case.  (See Mot. to Dismiss, ECF No. 7.)  The court denied WSU's motion in part and significantly narrowed Ms. Thomas's case.  (See ECF No. 18.)  The court held that only Ms. Thomas's first theory supported a cognizable Title IX claim: "[I]t is plausible that [WSU] was deliberately indifferent when it took no action after Dr. Abel, through Ms. Knapp, initially learned of Dr. Baird's sexual behavior toward Ms. [Thomas]. … [but] Ms. [Thomas's] other allegations of deliberate indifference are inadequate."  (Id. at 10–11.)  The court held that Ms. Thomas did not adequately plead her other theories because "[s]he provide[d] no facts suggesting that [WSU] was unreasonable in directing Ms. [Thomas] to file a complaint with the Title IX office.  Additionally, Title IX does not give

Ms. [Thomas] the right to decide how [WSU] should have conducted its investigation nor how it should have punished Dr. Baird."  (Id. at 11.)

Ms. Thomas did not petition the court for permission to file her complaint using a pseudonym, as required by the Tenth Circuit and implied by the Federal Rules of Civil Procedure.  See W.N.J. v. Yocom, 257 F.3d 1171, 1172 (10th Cir. 2001) ("When a party wishes to file a case anonymously or under a pseudonym, it must first petition the district court for permission to do so. … Where no permission is granted, the federal court lacks jurisdiction over the unnamed parties[.]") (citation omitted); see Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties ….."); Fed. R. Civ. P. 17(a) ("An action must be prosecuted in the name of the real party in interest.").  As a result, WSU filed a motion requesting that the court limit Ms. Thomas's use of a pseudonym (see WSU Mot. for Protective Order, ECF No. 34 at 7–9).  In response, Ms. Thomas requested that the court allow her to act under the pseudonym Jane Doe.  (See Resp. in Opp'n to WSU Mot. for Protective Order, ECF No. 36 at 9.)  WSU then filed another motion to dismiss the case (ECF No. 38), arguing that because Ms. Thomas filed her complaint under a pseudonym without seeking leave from the court, the court lacked subject matter jurisdiction over the complaint.  Around the same time, Ms. Thomas filed a motion for leave to file under a pseudonym (ECF No. 39).  The court ultimately denied WSU's motion (see Mem. Decision & Order, ECF No. 55), and United States Magistrate Judge Daphne A. Oberg denied Ms. Thomas's motion for leave to file under a pseudonym (see Mem. Decision & Order, ECF No. 49).  But Judge Oberg allowed Ms. Thomas to re-file her complaint under her real name and without redactions.  (See id. at 2, 10 (finding that the pseudonym-causing jurisdictional defect was curable).)

9

WSU moved for summary judgment on April 13, 2023.  (See ECF No. 114.)  Shortly after, WSU filed additional motions requesting that the court issue an order: 1) excluding Ms. Thomas's psychological evaluation performed by Dr. Stevan Hobfoll and any expert opinions resulting from or related to that evaluation (ECF No. 121); 2) striking Ms. Thomas's non-retained expert disclosures (ECF No. 124); and 3) staying the case pending a ruling on the motion to exclude (ECF No. 122).  Neither WSU's motion to exclude (ECF No. 121) or its motion to strike (ECF No. 124) relates to dispositive issues in these motions for summary judgment.

The court found good cause to grant WSU's request for a stay because Ms. Thomas's disclosure of Dr. Hobfoll's evaluation would require WSU to invest time and expense to find and designate a rebuttal expert for what WSU alleged was previously undisclosed evidence that might not be needed if the court ruled in WSU's favor on the motion to exclude.  (See Order Granting Mot. to Stay, ECF No. 133.)  Accordingly, the court stayed the case except for the deadlines and rulings related to WSU's motion for summary judgment, WSU's motion to exclude, and WSU's motion to strike.  (See id.)

Ms. Thomas then filed her motion for summary judgment (ECF No. 145).  Not only did she file her motion while the case was stayed in substantial part, but Ms. Thomas's response to WSU's motion for summary judgment—in particular, her rebuttal statement of material facts—also incorporated by reference the facts set forth in her motion for summary judgment.  (See Resp. in Opp'n to WSU Mot. Summ. J., ECF No. 144 at 13.)  After hearing from the parties on these issues, the court decided that it would allow Ms. Thomas to file her motion and would consider the incorporated statement of facts in Ms. Thomas's opposition to WSU's motion. (Order on Pl.'s Resp. to Order to Show Cause, ECF No. 163 at 2.)

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.  See Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"  Argo v. Blue Cross Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  But courts should disregard statements that could not be presented at trial in any admissible form.  See id.

Once the movant shows there is an absence of a genuine dispute of material fact, Celotex, 477 U.S. at 323, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'"  GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)).

"The standard for cross-motions for summary judgments is the same as for individual motions for summary judgment."  Cannon v. State Farm Mut. Auto. Ins. Co., No. 2:13-CV-186,

2013 WL 5563303, at *1 (D. Utah Oct. 7, 2013) (citation omitted).  "[The court] must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."  <u>Boyz Sanitation Serv., Inc. v. City of Rawlins</u>, 889 F.3d 1189, 1195 (10th Cir. 2018).

## ANALYSIS

### I.  Threshold Issues

Before the court can reach the merits of Ms. Thomas's Title IX claim, it must resolve three threshold issues that WSU argues bar Ms. Thomas's claim.  WSU asserts that: 1) Ms. Thomas's claim that WSU was deliberately indifferent to actual knowledge of Dr. Baird's harassment of her is barred by the four-year statute of limitations; 2) Ms. Thomas lacks statutory standing to bring her claim; and 3) Ms. Thomas's amended complaint is time-barred, as it does not relate back to the original complaint.  These arguments are not meritorious.

### A.  Statute of Limitations

Federal courts in Utah apply a four-year statute of limitations to Title IX claims.  <u>Henrie v. Carbon Sch. Dist.</u>, No. 2:19-cv-00732, 2022 WL 280799, at *9 (D. Utah Jan. 31, 2022) (citing <u>Varnell v. Dora Consol. Sch. Dist.</u>, 756 F.3d 1208, 1212 (10th Cir. 2014)).  To identify when the four-year statute of limitations period began to run, the court must first determine when Ms. Thomas's cause of action accrued.

In the Tenth Circuit, "a right accrues—starts the clock ticking on the limitations period— when the plaintiff has a complete and present cause of action."  <u>Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer</u>, 764 F.3d 1268, 1275 (10th Cir. 2014) (cleaned up).  The time of accrual of a Title IX claim is a matter of federal law, but "[f]ederal law governing accrual of causes of

action … 'conform[s] in general to common-law tort principles.'" <u>Varnell</u>, 756 F.3d at 1215 (quoting <u>Wallace v. Kato</u>, 549 U.S. 384, 388 (2007)).

In <u>Varnell</u>, Amber Shaw coached plaintiff Tori Varnell in multiple sports when Ms. Varnell was a middle school student in the Dora School District (the District). <u>Id.</u> at 1210. Ms. Shaw abused Ms. Varnell for over a year. <u>Id.</u> at 1210–11. Ms. Varnell sued the District after she graduated high school, bringing claims under the New Mexico Tort Claims Act, the Civil Rights Act of 1871, and Title IX. <u>Id.</u> at 1211. Ms. Varnell's mother officially reported Ms. Shaw's abuse to the District after Ms. Varnell graduated. <u>Id.</u>

Because the District argued that the statute of limitations barred Ms. Varnell's claims, the Tenth Circuit needed to determine when Ms. Varnell's causes of action accrued. <u>Id.</u> at 1212, 1215–17. The court determined the accrual of her Title IX claim by looking to the accrual date for the common-law tort most analogous to her § 1983 claim. <u>Id.</u> at 1217 (finding that there was "no reason why Plaintiff could not have brought a Title IX claim as soon as she brought one under § 1983"). Based on when accrual for a battery claim occurred, the court held that Ms. Varnell's Title IX "claim accrued no later than the last sexual abuse … sometime in late 2006 or early 2007." <u>Id.</u> at 1216. The court rejected Ms. Varnell's argument that her claims accrued later because she did not realize the extent of her injuries until right before filing suit. <u>See id.</u> at 1216–17.[2]

Here, Ms. Thomas had a complete and present cause of action under Title IX as early as May 7, 2015. This is the date that WSU, through Ms. Knapp and/or Dr. Abel, is first alleged to have had actual knowledge of Dr. Baird's harassment of Ms. Thomas. Ms. Thomas alleges that

---

[2] The court rejects Ms. Thomas's identical argument. "A plaintiff need not know the full extent of [her] injuries before the statute of limitations begins to run." <u>Indus. Constructors Corp. v. U.S. Bureau of Reclamation</u>, 15 F.3d 963, 969 (10th Cir. 1994).

WSU subjected her to further harassment of Dr. Baird's by failing to act after learning about Dr. Baird's harassment of her. Once Ms. Thomas's cause of action accrued on May 7, 2015, she had four years to bring her complaint. She failed to file it within that time.

But the continuing violations doctrine saves Ms. Thomas's claim from being untimely. The continuing violations doctrine applies "when [a] plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, as opposed to conduct that is a discrete unlawful act." Hamer v. City of Trinidad, 924 F.3d 1093, 1098 (10th Cir. 2019) (cleaned up). "The utility of the continuing violation doctrine lies in the fact that as long as one of the separate wrongful acts contributing to the collective conduct occurs within the filing period, a court may consider the entire time period—including those separate acts falling outside the filing period—for the purposes of determining liability." Id. at 1098–99 (cleaned up).

The Supreme Court recognized, but did not apply, the continuing violations doctrine in the context of a discriminatory act alleged to have violated Title VII of the Civil Rights Act of 1964. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 104, 110 (2002). Title VII requires claimants to file a discrimination charge within a specified number of days after an unlawful employment practice. Id. at 110–11 (interpreting "practice" to apply to a discrete act or single occurrence, rather than an ongoing violation to which the continuing violations doctrine would be applicable). The court distinguished this type of claim from a hostile work environment claim under Title VII. Id. at 115–17.

Whether the continuing violations doctrine applies to a Title IX claim is an open question in the Tenth Circuit, among other circuits. While some courts have refused to apply the doctrine in this context, several courts have. See Cavalier v. Cath. Univ. of Am., 306 F. Supp. 3d 9, 43–

44 (D.D.C. 2018) (holding that because courts have applied the doctrine to Title VII hostile environment claims, the same reasoning applies to Title IX claims); Papelino v. Albany Coll. of Pharmacy Union Univ., 633 F.3d 81, 91 (2d Cir. 2011) (same); Kunzi v. Ariz. Bd. of Regents, No. CV-12-02327, 2013 WL 6178210, at *3–5 (D. Ariz. Nov. 25, 2013) (finding that the facts alleging Title IX deliberate indifference are sufficient to show a systemic violation warranting the doctrine's application).

Some courts, including the Tenth Circuit, have applied the continuing violations doctrine in other contexts.  For example, the Tenth Circuit has held that the doctrine, as a general principle of the common law, is available in the § 1983 context.  See Herrera v. City of Espanola, 32 F.4th 980, 993–94 (10th Cir. 2022) (holding that nothing in the statute spoke directly to the continuing violations doctrine nor displaced it).  "To displace a generally applicable principle of federal common law, Congress must speak to the issue when crafting pertinent legislation."  Id. at 994.  The Seventh Circuit applied the doctrine to a plaintiff's § 1983 claim challenging prison officials' deliberate indifference to his need for medical treatment.  See Heard v. Sheahan, 253 F.3d 316, 318 (7th Cir. 2001).

The court finds that the continuing violations doctrine applies here.  The court is persuaded by the cases that have applied the doctrine in the Title IX context and by the Tenth Circuit's decision in Herrera that the doctrine applies to § 1983 claims.  Similar to § 1983, nothing in Title IX speaks directly to the continuing violations doctrine nor displaces its application as a principle of general common law.  See 20 U.S.C. § 1681.  Ms. Thomas has alleged sufficiently serious misconduct "within the statute of limitations period such that [she] can employ the continuing violation[s] doctrine to sustain [her] action."  See Burkley v. Corr. Healthcare Mgmt. of Okla. Inc., 141 F. App'x 714, 716 (10th Cir. 2015).  Her relevant

allegations are that WSU failed to act in response to its officials having actual knowledge of Dr. Baird's harassment of Ms. Thomas, beginning May 7, 2015, and that WSU subjected Ms. Thomas to further harassment of Dr. Baird's through December 2017.  While Ms. Thomas's third round of therapy sessions with Dr. Baird ended in July 2016, she continued to experience harm as a WSU student in fall 2016 and in fall 2017 as a student in Dr. Baird's class.  Unlike the plaintiff in Varnell v. Dora Consolidated School District, Ms. Thomas continued to experience harm after WSU officials were allegedly put on notice.  No. 12-CV-905, 2013 WL 12146483, at *1 (D.N.M. May 13, 2013) (explaining that the date of Ms. Shaw's last known abuse of Ms. Varnell occurred at or around the time school district officials were alleged to have become aware of Ms. Shaw's abuse).  Ms. Thomas is challenging a series of omissions during the statute of limitations period that together constitute a systemic violation, not discrete acts, occurrences, or omissions of WSU's.  Because the misconduct alleged is within the statute of limitations period, Ms. Thomas's claim is not time-barred.

## B. Statutory Standing

WSU asserts that Ms. Thomas lacks statutory standing to pursue her Title IX claim. Statutory standing is distinct from constitutional standing and requires a plaintiff suing under a statutory cause of action to "fall within [the] zone of interests protected by the law invoked." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129 (2014) (citation omitted).  WSU claims that Ms. "Thomas was not a student at any point during [her] sessions" with Dr. Baird and, accordingly, lacks standing to sue under Title IX.  (See ECF No. 114 at 29.) This is both factually and legally wrong.

Courts that have assessed a Title IX plaintiff's statutory standing have not limited the statute's protections to students alone.  In Doe v. Brown University, the First Circuit "clarif[ied]

16

… that a victim does not need to be an enrolled student at the offending institution in order for a Title IX private right of action to exist."  896 F.3d 127, 132 n.6 (1st Cir. 2018).  This is because "[m]embers of the public regularly avail themselves of the services provided by educational institutions receiving federal funding."  Id.  The plaintiff in Doe ultimately lacked statutory standing because she "failed to allege that she had availed herself of any of Brown University's educational programs in the past or that she intended to do so in the future."  Id.

Title IX's protections also extend to employees.  See North Haven Bd. of Ed. v. Bell, 456 U.S. 512, 530 (1982) (finding that Title IX's legislative history showed that "employment discrimination comes within the [statute's] prohibition"); see also Lopez v. San Luis Valley, Bd. of Co-op Edu. Servs., 977 F. Supp. 1422, 1425 (D. Colo. 1997) ("No court has held that a plaintiff who is neither a potential beneficiary of a federally funded education program nor an employee of such a program can maintain a Title IX action for sex discrimination.").  While the Lopez court mentioned that "many courts, in dicta, have limited the range of proper Title IX plaintiffs to students and program employees[,]" the court did not limit Title IX standing to students only.  Id.

Beginning in fall 2009, and until at least December 2017, Ms. Thomas was a WSU student, employee, and potential beneficiary of WSU educational programs.  (See ECF No. 144-1; see also ECF No. 144-5 at 7.)  Ms. Thomas attended WSU for her undergraduate degree from fall 2009 to spring 2014 and from fall 2016 to spring 2019 for her master's degree.  (ECF No. 144-5 at 37; ECF No. 114-4 at 14:6–15:12, 21:5–7.)  Her first round of therapy sessions with Dr. Baird began when she was a student.  (See ECF No. 114-4 at 16:24–17:2.)  Between August 2014 and July 1, 2016, during her second and third rounds of sessions with Dr. Baird (see id. 25:19–26:2, 33:24–34:10), Ms. Thomas worked for WSU's Multicultural Student Center.  (See

ECF No. 144-5 at 37.) As a WSU student and employee, Ms. Thomas was a beneficiary of WSU programs. Between July 1, 2016, and September 2016, Ms. Thomas, as an incoming graduate student, was a potential beneficiary of WSU's educational programs. (ECF No. 144-1 at 3.) Ms. Thomas therefore has statutory standing. See Lopez, 977 F. Supp. at 1425; see also Doe, 896 F.3d at 132 n.6 (stating that a plaintiff who alleges she has availed herself of a federal funding recipient's education programs or has the intent to avail herself of such programs has standing to sue under Title IX).

### C. Timeliness of Amended Complaint

As stated in the Background section above, Ms. Thomas filed the original complaint in May 2020 under a pseudonym without seeking leave of court. WSU argues that the court did not acquire jurisdiction until Ms. Thomas filed her amended complaint in November 2021 and by that time, there was nothing for the amended complaint to relate back to. The court has already held that a pseudonym-causing jurisdictional defect can be cured through the filing of an amended complaint. (See ECF No. 55 at 4 (affirming Judge Oberg's memorandum decision and order (ECF No. 49)).)

Because the court held that the pseudonym-causing jurisdictional defect could be cured, Ms. Thomas's amended complaint "assert[ed] a claim … that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Ms. Thomas's amended complaint therefore relates back to the date she filed her original complaint, and the court will assess the merits of Ms. Thomas's Title IX claim.

### II. Ms. Thomas's Title IX Claim

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

18

education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).

Schools receiving federal funding may be liable for damages under Title IX when "they are

deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so

severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to

the educational opportunities or benefits provided by the school."  Davis ex rel. LaShonda D. v.

Monroe Cnty. Bd. of Ed., 526 U.S. 629, 650 (1999).  To be liable, schools receiving federal

funding must also "exercise[] substantial control over both the harasser and the context in which

the known harassment occurs."  Id. at 645.  "[D]iscrimination occurs when a university obtains

notice of sexual harassment and responds with deliberate indifference."  Ross v. Univ. of Tulsa,

859 F.3d 1280, 1282 (10th Cir. 2017).

To prevail as a Title IX plaintiff, Ms. Thomas must show that WSU had actual

knowledge or notice of, and was deliberately indifferent to, harassment by Dr. Baird (of her

and/or others) that was so severe, pervasive, and objectively offensive that it deprived Ms.

Thomas of access to WSU's educational opportunities or benefits.  See Davis, 526 U.S. at 650.

She must also show that WSU exercised substantial control over Dr. Baird and the context in

which the known harassment occurred.  See id. at 645.  WSU argues that Ms. Thomas cannot

prove that: 1) WSU had actual knowledge or notice of the harassment; 2) WSU acted with

deliberate indifference to the harassment of which it had actual knowledge; and 3) WSU

exercised substantial control over Dr. Baird and the context in which his known harassment

occurred.

### A.  Actual Knowledge or Notice of the Harassment

"To trigger Title IX liability, a university must have actual notice through an appropriate

person."  Ross, 859 F.3d at 1288 (citing Escue v. N. Okla. Coll., 450 F.3d 1146, 1152 (10th Cir.

2006)).  Actual notice requires "witnessing an incident or receiving a report of an incident." C.H. v. Howard, No. 21-574, 2023 WL 7279329, at *4 (D.N.M. Nov. 3, 2023); see also Doe v. Galster, 768 F.3d 611, 614 (7th Cir. 2014) ("To have actual knowledge of an incident, school officials must have witnessed it or received a report of it.").  But "[a]ctual notice of harassment does not occur if the individual hears about or witnesses conduct that is inappropriate but dissimilar to the harassment."  C.H., 2023 WL 7279329, at *4 ("[A]n individual's knowledge that misconduct might be occurring and could be uncovered by further investigation is not sufficient for actual notice.").

In Gebser v. Lago Vista Independent School District, the Court held that the school district lacked actual notice where the "only official alleged to have had information about [a teacher's] misconduct [was] the high school principal" and the information "consisted of a complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class, which was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student."  524 U.S. 274, 291 (1998). While "Gebser makes clear that actual notice requires more than a simple report of inappropriate conduct by a teacher … the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff[.]"  Escue, 450 F.3d at 1154 (citation omitted).

The Tenth Circuit has held that prior instances reported, as opposed to notice of the Title IX plaintiff's harassment, do not satisfy actual knowledge where the prior instances reported were "too dissimilar, too infrequent, and/or too distant in time to provide the school with actual knowledge of sexual harassment in its programs."  Id. at 1153.  But other students' earlier

complaints about a university employee that put the university on notice that the employee posed a "substantial risk of abuse" can be actual knowledge.  Id. at 1154.

"An appropriate person 'is, at a minimum, an official of the [university] with authority to take corrective action [on behalf of the university] to end the discrimination.'"  Ross, 859 F.3d at 1283 (quoting Gebser, 524 U.S. at 290).  Courts have held that duties to report any suspected harassment do not amount to authority to take corrective measures.  See id. at 1290 (citing Plamp v. Mitchell Sch. Dist. No. 17-2, 565 F.3d 450, 459 (8th Cir. 2009) (finding that "[s]uch a holding would run contrary to the purposes of [Title IX].")).  To determine whether someone is an appropriate person, the court must look beyond job titles; the Tenth Circuit has held that persons could be appropriate persons "if they exercised control over the harasser and the context in which the harassment occurred."  Murrell v. Sch. Dist. No. 1, Denver, 186 F.3d 1238, 1247–48 (10th Cir. 1999).

Ms. Thomas asserts two theories of liability against WSU.  The first is that WSU had actual knowledge that Dr. Baird harassed other patients and/or students, and that WSU's deliberate indifference to that harassment caused Ms. Thomas to be subjected to Dr. Baird's harassment.  Second, Ms. Thomas argues that WSU had actual knowledge that Dr. Baird harassed her specifically and that WSU's deliberate indifference to that harassment caused Ms. Thomas to be further subjected to Dr. Baird's harassment.

1.  First theory of liability

 The court did not address Ms. Thomas's first theory of liability in its order on WSU's

motion to dismiss because it was not clear from the face of Ms. Thomas's complaint or in the briefing on that motion that she was asserting this theory of liability against WSU.[3]  But now, at summary judgment, Ms. Thomas asserts that WSU acted with deliberate indifference to actual knowledge of Dr. Baird's harassment of individuals such that WSU was on notice that Dr. Baird presented a substantial risk of abuse.[4]  Ms. Thomas specifically alleges that WSU received several complaints from individuals that she argues put WSU on notice.  Ms. Thomas alleged facts relating to some of these complaints in her complaint, but not all of them.  (See ECF No. 2.) And while the court held in its order on WSU's motion to dismiss that it "can infer [from these complaints] that … [WSU] was on notice that Dr. Baird presented a substantial risk of abuse to students" (ECF No. 18 at 9), no reasonable jury could reach that conclusion on the full record before the court, which contains more details about the prior complaints.

One of these complaints was from a female student who complained about Dr. Baird's gender-based treatment of her while he was her professor.  (See ECF No. 145 at 6; see also Email from Dr. Eric Amsel Re: Gender Compl. dated Mar. 29, 2011, ECF No. 154-7 (responding to complaints about Dr. Baird).)  The student alleged that Dr. Baird graded her unfairly.  (See Emails between Dr. Dianna Abel & Barry Gomberg dated Jan. 16, 2013, ECF Nos. 144-16 & 144-20 ("The student had considered whether Dr. Baird had possibly based his grading decision on her national origin, gender or other protected category.").)  No reasonable jury could find that this complaint—regarding conduct entirely dissimilar to the harassment as alleged by Ms.

---

[3] In their briefing, the parties addressed whether Ms. Thomas alleged enough facts to find that it was plausible that WSU had actual knowledge that Dr. Baird posed a substantial risk of abuse to students based on prior instances reported.  But the parties did not brief whether Ms. Thomas alleged facts sufficient to infer that WSU acted with deliberate indifference to those complaints.
[4] See Ross, 859 F.3d at 1283 ("[T]he dispositive issue] is whether a fact-finder could reasonably infer that an appropriate person at the university had actual notice of a substantial danger to others").

Thomas—put WSU officials on notice that Dr. Baird posed a substantial risk of abuse.  <u>See</u> <u>Escue</u>, 450 F.3d at 1153.

Another complaint Ms. Thomas emphasizes was from a former patient of Dr. Baird's who alleged in 2012 that, in 1997, Dr. Baird abused him for seven months at a residential treatment facility in Syracuse, New York.  (<u>See</u> Email from Brandon DeHope to WSU Human Resources dated Dec. 27, 2012, ECF No. 144-17.)  After receiving the complaint, WSU's Human Resource Department asked the individual for more information.  (<u>See</u> Email from Cherrie Nelson to Brandon DeHope dated Jan. 8, 2013, ECF No. 169-7 at 3.)  WSU officials "believe[d] it would be helpful to bring the STAR [t]eam together" to provide further information about the complaint.  (Email from Dane LeBlanc to Cherrie Nelson, Berry Gomberg, Stephanie Hollist, & Jeffrey Hurst dated Apr. 9, 2013, ECF No. 169-7 at 5.)  The STAR team then conducted a threat assessment of Mr. DeHope's complaint, ultimately finding his allegations not credible.  (<u>See</u> STAR Case Rep. of Brandon DeHope, ECF No. 144-19.)  This complaint, too, is "dissimilar" to the harassment experienced by Ms. Thomas, but it is also "too infrequent, and/or too distinct in time … to impose liability on [WSU] for its failure to take action before Ms. [Thomas]'s claims arose."  <u>See</u> <u>Escue</u>, 450 F.3d at 1153 (citation omitted).

In addition to these two complaints, Ms. Thomas also contends that WSU knew about Dr. Baird's 2004 therapy incident.  (<u>See</u> ECF No. 114-2 at 30:11–25.)  In 2004, when Dr. Abel was Dr. Baird's supervisor at CPSC, he alerted her that he received a call from a client's father expressing concern about conduct that had occurred in a therapy session with his daughter.  (<u>Id.</u>)  The client was also a WSU student.  (<u>See</u> Answer, ECF No. 27 at ¶ 39 (admitting that a WSU official conducted a supplemental investigation of the student's father's complaint).)  In Dr. Abel's deposition, she recalled that Dr. Baird told her he had been working with the client "on a

breathing technique and that, in order to assess whether or not the client was doing that technique properly, he placed his hands on her stomach and that later the client had gone home and told her father about that contact[.]"  (ECF No. 114-2 at 31:4–14.)  Dr. Abel advised Dr. Baird not to touch clients, and "[Dr. Baird] appeared to take th[e] guidance seriously."  (Id. 31:15–25.)

Though Dr. Abel was Dr. Baird's supervisor at the time, a reasonable jury could not find that Dr. Abel's knowledge based on this one earlier incident was such that WSU was on notice that Dr. Baird presented a substantial risk of abuse.  This was not a report of harassment, but instead was at most a "simple report of inappropriate conduct by a [school therapist]."  Escue, 450 F.3d at 1154.  "[A]n individual's knowledge that misconduct might be occurring" is similarly insufficient for finding actual notice.  C.H., 2023 WL 7279329, at *4.  The record shows that Dr. Baird brought the complaint to Dr. Abel's attention, Dr. Abel told Dr. Baird to not touch patients, and Dr. Baird responded positively to that guidance.  The circumstances surrounding this complaint do not demonstrate that WSU would have been on notice that Dr. Baird presented a substantial risk of abuse.

2.  Second theory of liability

On Ms. Thomas's second theory of liability—that WSU officials had actual knowledge of Dr. Baird's harassment of Ms. Thomas and acted with deliberate indifference, thereby subjecting Ms. Thomas to further harassment—Dr. Abel and Ms. Knapp are the only two individuals whose actual knowledge is material because no other WSU officials are alleged to have known about Dr. Baird's harassment of Ms. Thomas until December 2017.  The court has already precluded Ms. Thomas's arguments that WSU acted with deliberate indifference in December 2017 when

24

CPSC staff directed Ms. Thomas to file a formal Title IX complaint because that response was reasonable.  (See ECF No. 18 at 11.)[5]

a.   Ms. Knapp

A reasonable jury could find that Ms. Knapp had actual knowledge of Dr. Baird's harassment and that she knew he posed a substantial risk of abuse to students.  Even so, no reasonable jury could find that she was an "appropriate person" for Title IX liability.

When Ms. Thomas called Ms. Knapp on May 7, 2015, she sought clarification on her "therapy care[.] … I was asking her if [the mindfulness exercise and the gluteal massage] sounded like therapy to her since she was a therapist, too."  (ECF No. 114-4 at 110:21–25.)  It is undisputed that Ms. Thomas shared these details with Ms. Knapp.  (See ECF No. 114-18 at 32:1–10 ("[F]rom what I recall … he gave her a leg massage, and then he did some sort of breathing activity with his hand on her … He had his hands like kind of up her shirt … [and] at some point, [he] pulled on her pants to stimulate her genitals.").)  Ms. Knapp knew that, at the time of the call, Ms. Thomas was working at WSU.  (ECF No. 114-4 at 114:15–17.)

---

[5] Nevertheless, Ms. Thomas continues to argue that WSU was deliberately indifferent after several WSU officials learned of Dr. Baird's misconduct in December 2017.  (See ECF No. 144 at 33–34 (claiming that from the knowledge of Dr. Abel, Dean of Students Jeffrey Hurst, WSU Psychology Department Chair Aaron Ashley, and CPSC counselors Jeanette Wood and Craig Oreshenick, WSU was deliberately indifferent to Dr. Baird's harassment).)  The CPSC staff members were not only bound by confidentiality, but CPSC informed Ms. Thomas of her reporting options.  Because WSU did not act with deliberate indifference, Mr. Hurst's and Mr. Ashley's knowledge of the harassment were not material.  Ms. Thomas also claims that counselors Wood and Oreshenick acted with deliberate indifference for failing to report Dr. Baird's misconduct to DOPL.  But whether therapists violated "therapy duties to report illegal behavior of other therapists[,]" (id. at 2), bears little on the court's determination of whether WSU is liable under Title IX.  The court has already held that Ms. Thomas's complaint provided no facts suggesting that WSU was unreasonable in directing Ms. Thomas to file a formal Title IX complaint.  (ECF No. 18 at 11.)  And Title IX does not give Ms. Thomas the right to decide how WSU should have conducted its investigation nor how it should have punished Dr. Baird.  (Id.)

Ms. Knapp and Ms. Thomas dispute whether Ms. Knapp asked Ms. Thomas if she was talking about Dr. Baird on the call.  Ms. Thomas says that after she explained her concerns, Ms. Knapp asked if she was talking about Dr. Baird.  (See id. 111:13–15.)  In contrast, Ms. Knapp testified in her deposition that Ms. Thomas did not name Dr. Baird, and she could not guess who it was.  (See ECF No. 114-18 at 31:11–24.)  But Ms. Knapp also submitted a contradictory declaration that, "based on a conversation I had with Areli Thomas, I called the [DOPL] to report potential ethical violations committed by [Dr.] Baird."  (ECF No. 114-16 at ¶ 7.)[6]  Ms. Knapp also knew about the 2004 CPSC incident involving Dr. Baird and a breathing exercise.  (See ECF No. 114-18 at 13:18–14:17.)  In Ms. Knapp's deposition, she remembered that Dr. Abel told her about the incident, but not when she learned about it.  (See id. at 13:12–25.)  Finally, Dr. Abel testified that Ms. Knapp named Dr. Baird in their conversation together.  (See ECF No. 114-2 at 26:18–24, 27:11–14.)  Drawing all reasonable inferences in Ms. Thomas's favor, a reasonable jury could find that Ms. Knapp knew Ms. Thomas was talking about Dr. Baird on the May 7, 2015, phone call.

The record demonstrates that a reasonable jury could find actual knowledge.  Ms. Knapp had "more than a simple report of inappropriate conduct by a teacher[.]"  See Escue, 450 F.3d at 1154.  She received a report of the incidents from Ms. Thomas.  See C.H., 2023 WL 7279329, at *4.  Ms. Thomas also shared specific details of the misconduct with Ms. Knapp.  Cf. Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1120 (10th Cir. 2008) (not finding actual knowledge without sufficient details of the misconduct).  From Ms. Thomas's

---

[6] Ms. Thomas disputes that Ms. Knapp reported Ms. Thomas's concerns about Dr. Baird to DOPL (see ECF No. 144 at 7), but this is immaterial.  As stated above, whether therapists violated "therapy duties to report illegal behavior of other therapists" has little bearing on the court's determination of whether WSU is liable under Title IX.

description, Ms. Knapp knew who was reportedly involved, what reportedly happened, when the incidents reportedly occurred, and where it occurred.  See Ross, 859 F.3d at 1287 (finding that campus-security officers had actual knowledge because they knew the who, what, where, and when of the misconduct).  A reasonable jury could find that Ms. Knapp had actual knowledge of Dr. Baird's harassment of Ms. Thomas from the May 7, 2015, phone call alone.

There is also evidence that Ms. Knapp witnessed inappropriate behavior of Dr. Baird's while she was doing research with him in years past and that she found some of his comments and mannerisms uncomfortable.  (ECF No. 114-18 at 16:21–17:18, 18:21–20:19.)  In the Ogden Police Report and during the WSU investigations into Dr. Baird's misconduct, Ms. Knapp reported that "Doctor Baird would also inappropriately touch other female students."  (ECF No. 114-15 at 4.)  To the Ogden Police, Ms. Knapp disclosed that Dr. Baird's reactions "with the female students in [the research] program were always concerning to her."  (ECF No. 144-7 at 36.)  On the record before the court, a reasonable jury could find that Ms. Knapp knew Dr. Baird posed a substantial risk of abuse to students.

While a reasonable jury could find that Ms. Knapp had actual knowledge of Dr. Baird's harassment of Ms. Thomas and that he posed a substantial risk of abuse to students, no reasonable jury could find that Ms. Knapp was an "appropriate person" under Title IX.  In May 2015, Ms. Knapp was an adjunct professor in WSU's psychology department.  (ECF No. 114-16 at ¶ 4.)  She "ha[d] never been Professor Baird's supervisor and [she] did not [ever] have any authority to fire or discipline him."  (Id. ¶ 6.)  This is undisputed.  On the record before the court, no reasonable jury could find that she had the authority to take corrective action against Dr. Baird on behalf of WSU or that she exercised control over his private therapy practice.  See

Ross, 859 F.3d at 1284 (holding that campus-security officers did not have "authority to take corrective action [on behalf of the university] to end the discrimination").

b.  Dr. Abel

Although Dr. Abel did not know Ms. Thomas's identity or that she was affiliated with WSU from the phone call with Ms. Knapp, there is at least some evidence that Dr. Abel knew Dr. Baird posed a substantial risk of abuse to WSU students.  But, as explained below, a reasonable jury could not find that Dr. Abel was an "appropriate person" for Title IX liability.

Regarding whether Dr. Abel had actual knowledge of Dr. Baird's harassment of Ms. Thomas, Ms. Knapp informed Dr. Abel of Ms. Thomas's concerns about Dr. Baird but did not identify Ms. Thomas or share that she was affiliated with WSU.  (See ECF No. 114-2 at 26:21–24; see also ECF No. 114-18 at 41:15–21, 43:1–2.)  This is undisputed.  Ms. Knapp instead told Dr. Abel that someone called her to discuss concerns about what her therapist was doing to her in therapy.  (See ECF No. 114-18 at 41:16–25.)  Dr. Abel recalls Ms. Knapp naming Dr. Baird on the call, but Ms. Knapp claims she never mentioned Dr. Baird by name.  (Compare ECF No. 114-2 at 26:18–24, 27:11–14 with ECF No. 114-18 at 42:18–25.)  The extent of the details Ms. Knapp shared with Dr. Abel is also disputed.  (Compare ECF No. 114-2 at 27:22 ("I didn't know any details.") with ECF No. 114-18 at 41:22–23 ("I did tell Dianna, 'Hey, X, Y, and Z took place.'").)  Drawing all reasonable inferences in Ms. Thomas's favor, the court assumes for the purposes of this order that Ms. Knapp named Dr. Baird on the call with Dr. Abel and relayed everything Ms. Thomas told her to Dr. Abel.  But Dr. Abel still did not know that the patient was

Ms. Thomas or that she was a former and future WSU student, in addition to a WSU employee in May 2015.

Dr. Abel did not witness Dr. Baird's misconduct of Ms. Thomas, nor did she receive a report of Dr. Baird's misconduct of Ms. Thomas.  See C.H., 2023 WL 7279329, at *4 (finding that actual notice requires "witnessing an incident or receiving a report of an incident"); see also Escue, 450 F.3d at 1150, 1155 (finding that Northern Oklahoma College (NOC) had actual notice after Ms. Escue and her father met with NOC's president to report an incident when Ms. Escue's teacher pulled on her shirt and looked down it).  Dr. Abel received a report of possible misconduct from Ms. Knapp, who had received the report from someone else.  Dr. Abel recalls that she "understood something inappropriate and sexual in nature" was going on in private therapy from the call (see ECF No. 114-2 at 27:17–19), but what exactly was going on was not known (nor was it clear to Ms. Thomas at that time (see ECF No. 144-1 at 3 ("During Baird's lectures and his explanations about the therapeutic setting in treating mental issues and disorders [in fall 2017], I started discovering that Baird's behavior toward me in therapy was highly inappropriate."))).  From her call with Ms. Knapp, Dr. Abel also lacked the most significant detail: that the patient was affiliated with WSU.  (ECF No. 114-2 at 26:22–24, 27:15–22).  Title IX liability is imposed "only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities."  Davis, 526 U.S. at 633 (emphasis added).  To Dr. Abel's knowledge, the potential misconduct she knew about was not occurring in a WSU program or activity.

But Dr. Abel also had knowledge of the 2004 incident involving Dr. Baird.  As a result, there is at least some evidence that—after hearing an additional complaint about Dr. Baird in 2015 and with the knowledge of the past incident—Dr. Abel could have inferred that Dr. Baird

posed a substantial risk of abuse to students.  Dr. Abel knew that Dr. Baird had an active, private therapy practice and that he interacted with students at WSU in his role as a professor.  The complaints received about Dr. Baird's therapy practices were similar, suggesting to Dr. Abel that Dr. Baird did not take her guidance from 2004 seriously.

At the time she learned of the 2015 complaint, however, Dr. Abel was not an "appropriate person" for Title IX liability.  The court here previously held that it was plausible Dr. Abel was an "appropriate person" based on her position with the STAR team (see ECF No. 18 at 9), but a reasonable jury could not make that finding based on the full record before the court, which contains crucial details about the STAR team.  According to WSU's Director of Public Safety, Dane LeBlanc, "[t]he STAR team does not have authority to discipline students, faculty or staff[,]" and "[it] is not an investigative body[.]"  (See ECF No. 114-20 at ¶¶ 12–13.)  As a result, Dr. Abel's position with the STAR team does not change the fact that, in 2015, she lacked disciplinary authority over Dr. Baird.  (See ECF No. 114-19 at ¶ 4.)  While at one point Dr. Abel was Dr. Baird's supervisor at CPSC (see ECF No. 114-2 at 30:7–25), she no longer had that role in 2015.  Moreover, the court is not persuaded that whether Dr. Abel was a Campus Security Authority (CSA) is material.  Her status as a CSA is disputed.  (See ECF No. 144 at 8 (explaining that the purpose of a CSA is to "make sure that when information [related to] a potential Title IX violation is reported … the information gets shared with the AA/EO [and Title IX office]"); see also ECF No. 114-2 at 74:2–76:23 ("[A]re you a part of [CSA]? No. … [and] [i]t has never been my understanding that I am[.]").)  Yet even if Dr. Abel was a CSA, duties to report suspected harassment do not amount to authority to take corrective measures.  See Plamp, 565 F.3d at 459.  In 2015, Dr. Abel could not take disciplinary actions against Dr. Baird on behalf of WSU, nor did she have any authority to control Dr. Baird's private therapy practice.

Because no reasonable jury could find that Dr. Abel was an "appropriate person," it would be improper to impose liability on WSU for what Dr. Abel knew.

## B. Conclusion

Ms. Leonard's independent investigation into Dr. Baird's misconduct as it concerned Ms. Thomas revealed disturbing findings that ultimately prompted WSU to terminate Dr. Baird's employment.  (See ECF No. 114-15 at 4–5.)  The court sympathizes with Ms. Thomas, who has presented evidence that she has suffered significant harm from her interactions with Dr. Baird. Because Ms. Thomas acted and reported Dr. Baird, WSU is no longer exposing students, employees, and potential beneficiaries of WSU programs to Dr. Baird's misconduct.

But Title IX liability does not rest on what Dr. Baird did or how egregious his actions were—it rests on what appropriate persons at WSU knew about Dr. Baird's misconduct and when.  The evidence Ms. Thomas has presented, even construed in the light most favorable to her, fails to demonstrate genuine issues over whether Ms. Knapp and Dr. Abel were appropriate persons such that it would be proper to hold WSU to be liable under Title IX.  Because no reasonable jury could find that Ms. Knapp and Dr. Abel were appropriate persons under Title IX, Ms. Thomas is unable to prove an essential element of her claim, and the court need not address whether WSU acted with deliberate indifference to the harassment or whether it exercised substantial control over Dr. Baird and the context in which the harassment occurred.

## III.   Ms. Thomas's Damages

Finally, WSU argues that Ms. Thomas's emotional distress damages are barred as a matter of law.  Because the court denies Ms. Thomas's motion for summary judgment, the court

need not address this argument.  Similarly, WSU's motion to exclude (ECF No. 121) and motion to strike (ECF No. 124) are moot.

**ORDER**

For the foregoing reasons, the court ORDERS as follows:

1.     WSU's motion for summary judgment (ECF No. 114) is GRANTED;

2.     Ms. Thomas's motion for summary judgment (ECF No. 145) is DENIED;

3.     WSU's motion to exclude Ms. Thomas's psychological evaluation (ECF No. 121) is TERMINATED as moot; and

4.     WSU's motion to strike (ECF No. 124) is TERMINATED as moot.

DATED this 29th day of March, 2024.

BY THE COURT:

TENA CAMPBELL
United States District Judge